UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 02-1418
(CA-01-519)

JH, a minor, etc., et al.,

Plaintiffs - Appellants,

versus

Henrico County School Board,

Defendant - Appellee.

O R D E R

The court amends its opinion filed April 21, 2003, as follows:

On the cover sheet, section 3, line 2 -- "Eastern District of Virginia, at Norfolk" is corrected to read "Eastern District of Virginia, at Richmond."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

JH, a minor, by and through his
parents and next friends, JD and
SS; JD; SS,
    *Plaintiffs-Appellants,*          No. 02-1418

     v.

HENRICO COUNTY SCHOOL BOARD,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-01-519)

Argued: January 22, 2003

Decided: April 21, 2003

Before WIDENER and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Senior Judge Hamilton
wrote the opinion, in which Judge Widener and Judge Gregory joined.

**COUNSEL**

**ARGUED:** William Henry Hurd, Richmond, Virginia, for Appel-
lants. Joseph Thomas Tokarz, II, Assistant County Attorney,
COUNTY OF HENRICO, Richmond, Virginia, for Appellee. **ON
BRIEF:** Edward M. Wayland, Charlottesville, Virginia, for Appel-

lants. Joseph P. Rapisarda, Jr., County Attorney, COUNTY OF HEN-
RICO, Richmond, Virginia, for Appellee.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

In this action arising under the Individuals with Disabilities Educa-
tion Act (the IDEA), 20 U.S.C. §§ 1400 to 1487, JH, a minor child,
and his parents, JD and SS,[1] seek $1,875 from the Henrico County
School Board (the County) as reimbursement for the costs associated
with the provision of speech/language and occupational therapy ser-
vices to JH during the summer of 2001.[2] The district court granted
summary judgment in favor of the County. JH, JD, and SS (collec-
tively the Plaintiffs) noted this timely appeal.

For reasons that follow, we vacate the judgment entered by the dis-
trict court in favor of the County and remand the case to the district
court with instructions that the district court remand the case to the
administrative hearing officer for further proceedings in accordance
with this opinion.

I.

In order to put the facts of this case in their proper perspective, we
will first set forth the relevant statutory and regulatory background.

In general, the IDEA requires all states which receive federal funds
for education to provide each child between the ages of three and
twenty-one, who has a disability, with a free appropriate public edu-
cation (FAPE). 20 U.S.C. § 1412(a)(1)(A). Congress enacted the

---

[1] We refer to the child and the child's parents by their initials in order
to protect the identity of the child.

[2] In IDEA parlance, educational services provided to a disabled child
during the summer in a school system where children do not normally
attend school during the summer are called extended school year services
(ESY Services). 34 C.F.R. § 300.309.

2

IDEA, in part, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). Notably, however, although the IDEA requires that "[s]tates must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child," it "does not require the furnishing of every special service necessary to maximize each handicapped child's potential." *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997) (internal quotation marks and citations omitted).

The IDEA requires a school district to provide an appropriate Individual Educational Program (IEP) for each disabled child. *MM v. School Dist. of Greenville Co.*, 303 F.3d 523, 527 (4th Cir. 2002). "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *Id.* Every IEP must be prepared by an IEP team, which consists of a representative of the school district, the child's teacher, the child's parents or guardian and, where appropriate, the child himself. 20 U.S.C. § 1414(d)(1)(B).

With this statutory and regulatory background in mind, we turn to the facts of the present case. There is no dispute that JH, who was born on May 16, 1994, suffers from a high functioning form of autism which qualifies as a disability under the IDEA. At all times relevant to this case, JH attended Dumbarton Elementary School, a school operated by the County.

In May 1998, the County classified JH as eligible for special education services under the IDEA. During the summer of 2000 (*i.e.*, the summer immediately preceding JH starting kindergarten), JH received ESY Services from the County consisting of a total of twelve hours of speech/language therapy and eight hours of occupational therapy.

Beginning in the fall of 2000, JH attended kindergarten with nondisabled children in a regular classroom at Dumbarton Elementary School under an IEP for the 2000-2001 school year (the Kindergarten

3

IEP).[3] The Kindergarten IEP set twenty-seven goals for JH to master by the end of his regular kindergarten school year. In order to meet these goals, the Kindergarten IEP provided JH six hours per day of one-on-one service by an instructional assistant in addition to two hours of speech/language therapy per week and two hours of occupational therapy per week.

Nancy Smith (Smith), a speech/language pathologist with twenty-eight years experience, provided JH his speech/language therapy, while Carolyn Stone (Stone), an occupational therapist with twenty-six years experience, provided JH his occupational therapy.[4] Stone had also provided occupational therapy services to JH during the 1999-2000 school year. During JH's regular kindergarten school year, Smith and Stone each saw JH at least three times per week and talked regularly with his classroom teacher, Howard Everette (Everette), and the instructional assistant assigned to JH.

At the time, Helen McGrath (McGrath) served as Dumbarton Elementary School's special education teacher. Although McGrath did not actually teach JH, per the Kindergarten IEP, she did provide Everette and the instructional assistant assigned to JH with one hour each week of consulting services regarding JH.

Various testing at the end of JH's regular kindergarten school year revealed that he had made substantial progress in some areas, but remained weak in others. In June 2001, JH took the Henrico County Assessment Test, scoring 85% in math, 100% in science, 80% in social studies, and 85% in language arts. Other assessment tests conducted at the end of JH's regular kindergarten school year revealed that he had mastered three of the twenty-seven goals in the Kindergarten IEP, and had made progress on all but two. JH had mastered the goals of (1) discriminating between nasal and non-nasal speech with 80% accuracy, (2) marking final consonants with 75% accuracy in conversation, and (3) using the mouse and keyboard on a computer consistent with the skill level of his classmates. Of specific relevance

---

[3] The Kindergarten IEP expired May 5, 2001. The Plaintiffs take no issue with the Kindergarten IEP.

[4] Both Smith and Stone have worked with autistic children since the mid-1970s.

4

in the present appeal, although JH had improved his skills with respect to using language appropriately in social situations, referred to as social pragmatics, he remained seriously behind his peers in that area. The two goals upon which JH had made absolutely no progress were (1) using contingent statements "(`I like the beach too. I found shells. We go swimming.')" to maintain conversations for five turns in four out of five opportunities, and (2) maintaining the same topic for five turns with no more than one verbal prompt in four out of five opportunities. (J.A. 707).

Because the Kindergarten IEP did not provide that JH would receive ESY Services during the summer of 2001, JD and SS requested an IEP team meeting in order to request that the County provide JH with such services. The meeting took place on May 14, 2001. JD and SS took the position that not only should the County provide JH with ESY Services for the summer of 2001, but that it should do so at the same level as provided in the Kindergarten IEP. The County agreed that JH needed ESY Services during the summer of 2001, but disagreed with JD and SS regarding the appropriate type and amount of such services. The County endorsed a peer modeling approach suggested by Smith and Stone in which JH would interact with his peers in order to improve his social language and fine motor skills. Based on Smith and Stone's experience with JH during the regular kindergarten school year, they believed that JH had difficulty generalizing social language skills taught in individual therapy sessions to other settings such as the classroom, playground, and home. Therefore, rather than focusing on one-on one services, Smith and Stone believed that JH would best be served by receiving ESY Services focused on improving JH's peer communication skills.

On June 11, 2001, the County members of the IEP team issued a final proposed IEP for JH for the summer of 2001 (the Summer 2001 IEP). The Summer 2001 IEP provided that while attending the regular ten week summer school session at Dumbarton Elementary School, JH would receive: (1) special education services four hours per day from July 9 through August 2 and ten hours per week from August 21 through September 1; (2) special education consultation for thirty minutes per week for the entire summer; (3) assistance from an instructional assistant twelve hours per week from June 18 through June 29, sixteen hours per week from July 9 through August 2, and

fifteen hours per week from August 6 through August 18; (4) individual speech/language therapy conducted in four thirty-minute sessions over the course of the summer; and (5) individual occupational therapy conducted in five thirty-minute sessions over the course of the summer.

JD and SS objected to the Summer 2001 IEP on the ground that it provided JH inadequate amounts of individual speech/language and occupational therapy. JD and SS wanted such therapies to continue at the same level as provided in the Kindergarten IEP. Under the Kindergarten IEP, JH had received two hours of individual speech/language therapy per week and two hours of individual occupational therapy per week.

Following an unsuccessful attempt at mediation, a due process hearing before an administrative hearing officer (the Hearing Officer) was held on July 30, 2001. Meanwhile, at the Plaintiffs' expense, JH received private speech/language and occupational therapy during the Summer of 2001 at the same level as provided in the Kindergarten IEP.

Before the Hearing Officer, the County contended that the only purpose of ESY Services is to maintain the progress that a disabled child had already made during the regular school year. The County also contended that the services provided in the Summer 2001 IEP would meet this goal and offered expert testimony and other evidence in support of this contention.

The Plaintiffs, in contrast, contended that in addition to maintaining the progress that a disabled child had already made during the regular school year, ESY Services should also be provided in order to help a disabled child master goals in the IEP for the regular school year that had gone unmet. The Plaintiffs also maintained that, in the case of autistic children, the maximum amount of ESY Services should be provided in order to take advantage of the limited "window of opportunity" for when such children are most able to effectively overcome deficits due to autism. In this regard, the Plaintiffs relied on the expert testimony before the Hearing Officer of Dr. Ronald David, M.D. (Dr. David), an associate clinical professor of pediatrics at the Medical College of Virginia. According to Dr. David, JH has a win-

6

dow of opportunity for when he can most effectively learn to overcome his deficits due to autism, which window will close at age eight or nine. In the opinion of Dr. David, after age eight or nine, JH will have a far more difficult time learning the skills that he needs to function in life.

The Plaintiffs also relied on the expert testimony before the Hearing Officer of Dr. Donald Oswald, Ph.D. (Dr. Oswald), a licensed clinical psychologist who works exclusively with autistic children and adults. According to Dr. Oswald, using the summer months merely to maintain the speech/language and sensory motor skills that an autistic child has already gained as opposed to using such time to actively foster continued development of such skills, will limit the child's ability to participate and benefit from a regular classroom setting and limit the extent to which he will be able to compensate for the functional limitations of autism.

The Hearing Officer issued his decision on August 7, 2001. Based upon all of the evidence before him, the Hearing Officer found that "JH needs the ESY with the same level of instruction in speech/language and OT that he received in kindergarten which is two hours of each, each week (four hours total) . . . ." (J.A. 528). The Hearing Officer agreed with the Plaintiffs that just maintaining the skills that JH had learned in kindergarten was not appropriate in light of JH's disability which left him with only a one or two year window of opportunity before his learning patterns changed. According to the Hearing Officer, the purpose of ESY Services is to make "reasonable progress" on unmet goals rather than simply maintaining gains already made. *Id.* However, the Hearing Officer rejected the Plaintiffs' position that the purpose of ESY Services is to master unmet goals of the IEP for the regular school year. As relief, the Hearing Officer ordered that the Summer 2001 IEP be amended to provide JH with two hours of speech/language therapy per week and two hours of occupational therapy per week. Finally, the Hearing Officer ordered that the stated goal of the Summer 2001 IEP "should be amended from `maintaining' to `making reasonable progress.'" (J.A. 529). The Hearing Officer did not address the issue of reimbursement for the expenses that JD and SS had already incurred in providing private speech/language and occupational therapy to JH during the Summer of 2001 at the same level as the Kindergarten IEP.

On August 13, 2001, the Plaintiffs filed the present action pursuant to 20 U.S.C. § 1415(i), seeking review of the Hearing Officer's decision. The Plaintiffs claimed that the Hearing Officer erred in failing to order that they be reimbursed for the speech/language therapy and occupational therapy services that JH received during the summer of 2001 at the same level as the Kindergarten IEP. The Plaintiffs also alleged that the Hearing Officer erred by refusing to order that the Summer 2001 IEP state as its overall goal that JH master goals unmet under the Kindergarten IEP. The County filed an answer and counterclaim, which counterclaim sought to reverse the Hearing Officer's decision regarding the level of speech/language and occupational therapy services.

The parties filed cross-motions for summary judgment. The district court granted summary judgment for the County on the County's counterclaim, holding that: (1) the Summer 2001 IEP was reasonably calculated to provide JH with educational benefit, and (2) the proper goal for the Summer 2001 IEP was to make reasonable progress on, rather than master, the stated goals.

The Plaintiffs noted the present appeal. Significantly, on September 6, 2002, just three weeks after the completion of the briefing schedule in this case, we issued *MM v. School District of Greenville County*, 303 F.3d 523 (4th Cir. 2002). In *MM*, we first announced a formal standard for determining when ESY Services are appropriate under the IDEA: "ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." *Id.* at 538. In *MM*, we carefully emphasized that, under this standard, "the mere fact of likely regression is not a sufficient basis, because all students, disabled or not, may regress to some extent during lengthy breaks from school." *Id.*

Prior to oral argument, we granted the parties leave to address, in writing, the impact of *MM* on the issues in the present appeal. We have that additional briefing before us for consideration.

II.

In *MM*, we set forth our standard of review with respect to a district court's decision to grant a motion for summary judgment in an IDEA case:

8

In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities. . . .

Whether a district court has accorded the proper "due weight" to the administrative proceedings is a question of law—or at least a mixed question of law and fact—to be reviewed de novo by an appellate court. In our review, we need not defer to factual recitations made by a district court from the administrative record, because that court stands in no better position than do we in reviewing the record. In conducting our review in an IDEA proceeding, we therefore must examine the entire record, and we must afford "due weight" to the administrative determinations, applying the standard of review utilized by the district court. However, where a district court has heard and considered additional evidence, . . . we review its findings of fact for clear error.

*Id.* at 530-31 (some internal quotation marks omitted) (citations omitted) (alteration in original). We further reiterated in *MM* that "[t]he courts should, to the extent possible, defer to the considered rulings of the administrative officers, who also must give appropriate deference to the decisions of professional educators." *Id.* at 533.

III.

The Plaintiffs primarily challenge the district court's grant of summary judgment in favor of the County on the basis that the district court erred by not giving appropriate deference to the Hearing Officer's findings. Relatedly, the Plaintiffs argue that the "reasonable progress" standard used by the Hearing Officer and the district court required that JH receive the same level of speech/language and occupational therapy services during the summer of 2001 as he had received under the Kindergarten IEP.

9

The County essentially takes the position that this case must be analyzed under the *MM* standard for ESY Services, and under such standard, the evidence shows that the Summer 2001 IEP provided JH a FAPE.

Prior to our decision in *MM*, the Fourth Circuit had not developed a standard for determining when ESY Services are appropriate under the IDEA. *Id.* at 537. Following *MM*, Fourth Circuit precedent is clear that "ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." *Id.* at 538.

The Hearing Officer addressed the Plaintiffs' challenge to the Summer 2001 IEP under a standard more favorable to the Plaintiffs than the standard provided in *MM*. The Hearing Officer assessed the adequacy of the Summer 2001 IEP by considering whether the level of services provided in the Summer 2001 IEP would allow JH to make reasonable progress on the skills targeted by such IEP. He ultimately determined that it would not, and decided that in order for JH to make reasonable progress on the skills targeted in the Summer 2001 IEP, JH would need to receive speech/language and occupational therapy services at the same level as provided in the Kindergarten IEP. Indeed, the Hearing Officer ordered the stated goal of the Summer 2001 IEP "amended from `maintaining' to `making reasonable progress.'" (J.A. 529). The district court agreed with the Hearing Officer's use of the "reasonable progress" standard, but disagreed with his weighing of the evidence presented at the due process hearing. (J.A. 528).

The goal of a disabled child making reasonable progress during the summer months on unmastered skills is obviously a higher goal than simply preventing the skills and benefits the same child has already gained from the regular school year from being significantly jeopardized. Given the fact that neither the Hearing Officer nor the district court had the benefit of our announcement in *MM* of the formal standard in our circuit for determining when and at what level ESY Services are necessary to a FAPE, their use of a different standard is understandable. Nevertheless, the situation presently leaves us with an appellate record that is inadequate for effective appellate review.

10

Most notably, the record does not contain a finding by the Hearing Officer regarding the appropriateness of the Summer 2001 IEP under the *MM* standard for ESY Services. In other words, the record does not contain a finding regarding whether the level of services provided in the Summer 2001 IEP was adequate to prevent the gains that JH had made during his regular kindergarten school year from being significantly jeopardized.[5]

Despite the lack of such a finding, we observe that the record indeed does contain conflicting evidence regarding whether the level of services provided in the Summer 2001 IEP was adequate to prevent the gains that JH made during his regular kindergarten school year from being significantly jeopardized. For example, in support of the Plaintiffs, the record contains the testimony of Dr. Oswald that "[r]educing the frequency of related services represents a significant change and a threat to the progress that JH and his teachers have worked so hard to achieve." (J.A. 834). Also in support of the Plaintiffs, the record contains the testimony of JH's private occupational therapist since March 1999, Geri Allen, that JH needs to continue two

---

[5] The Plaintiffs argue that this case must be decided under the reasonable progress standard used by the Hearing Officer and the district court because the County did not file a cross appeal challenging such use as erroneous. The Plaintiffs' argument is without merit. "[T]he general rule is that without taking a cross-appeal, the prevailing party may present any argument that supports the judgment in its favor as long as the acceptance of the argument would not lead to a reversal or modification of the judgment rather than an affirmance." *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1278 (Fed. Cir. 2001) (internal quotation marks omitted). *Accord El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 478-79 (1999) ("Absent a cross-appeal, an appellee may `urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court,' but may not `attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'") (quoting *United States v. American Ry. Express Co.*, 265 U.S. 425, 435 (1924)). Here, the County does not seek to modify the judgment in any way. Indeed, the County does no more than defend the judgment of the district court. Thus, no cross appeal by the County was necessary in order for the County to challenge the reasonable progress standard as incorrect.

11

hours of occupational therapy per week "so as not to regress . . . ." (J.A. 160).

We also observe that, with respect to JH, the record contains a questionnaire, completed by McGrath, entitled "CONSIDERATION FOR EXTENDED SCHOOL YEAR (ESY) Henrico County Public Schools." (J.A. 998). The questionnaire expressly states:

> Extended school year (ESY) is designed to provide a free appropriate public education to children with disabilities who experience significant regression of critical life skills because of an interruption in the instructional program. The information you provide below will assist in determining whether the above named student qualifies for ESY.

(J.A. 998). Of relevance to the *MM* standard for ESY Services, the form asks "[w]hat previous interruption in the educational program has caused a permanent, irreparable or major loss in this student's ability to perform?" (J.A. 999). McGrath answered: "Christmas - Thanksgiving - after illness. [JH] has great difficulty reorienting to the school environment, structure, and social settings." The questionnaire also asks: "What permanent, irreparable or major loss of critical life skills will occur as a result of interruption of this student's education?" McGrath answered: "Emerging communication, social, behavioral (sensory) skills, cognitive skills[, and] fine motor skills" (J.A. 999).

In support of the County's position that the Summer 2001 IEP met the *MM* standard for ESY Services, the County relies upon the testimony and reports of Smith and Stone. The Hearing Officer qualified both Smith and Stone as expert witnesses, and both testified from extensive personal knowledge of JH's specific educational performance. According to Smith, the Summer 2001 IEP provided JH a FAPE given that JH had reached parity with his peers in the areas of expressive language, receptive language, and articulation and that his remaining deficit area was social pragmatics. She further testified that the literature in the field indicates that social pragmatics should be taught in a natural setting, not one-on-one with a therapist. Therefore, Smith testified: "After working with [JH] this past year[,] . . . I think we would meet his needs better working in an integrated model in the

12

classroom setting or in small groups, so that he would have the opportunity to be able to interact with his peers." (J.A. 369). Stone concurred in this recommendation and testified that JH works best in the classroom "which is the natural setting for him," that he needs to practice and reinforce what he has been taught in all settings, and that he does not need a therapist with him while he does so. (J.A. 418). Specifically, with respect to the issue of regression, Smith testified that JH did not regress over school breaks. In fact, Smith directly disputed McGrath's opinion that JH's degree of progress on critical life skills would be affected if he did not receive ESY Services during the summer of 2001.

Because the record does not contain findings by the Hearing Officer with respect to whether the level of speech/language and occupational therapy services provided in the Summer 2001 IEP was adequate to prevent the gains that JH had made in these areas during his regular kindergarten school year from being significantly jeopardized, we are presently unable to conduct meaningful appellate review of the district court's judgment. Accordingly, we vacate that judgment and remand with instructions that the district court further remand the case to the Hearing Officer for reconsideration under the *MM* standard. We direct that upon such reconsideration, the Hearing Officer shall consider the "window of opportunity" evidence presented by the Plaintiffs to the extent that it is relevant to the question of whether the level of services provided in the Summer 2001 IEP was adequate to prevent the gains that JH had made during his regular kindergarten school year from being significantly jeopardized. We also direct that, prior to any decision being issued by the Hearing Officer, the parties be allowed to present oral and written argument before the Hearing Officer regarding the evidence in the record in support of their respective positions.

*VACATED AND REMANDED*

13