**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JH, a minor, by and through his
parents and next friends, JD and
SS; SS; JD,

        *Plaintiffs-Appellants,*

        v.

HENRICO COUNTY SCHOOL BOARD,

        *Defendant-Appellee.*

No. 04-1454

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-01-519-3)

Argued: October 28, 2004

Decided: January 20, 2005

Before WIDENER and GREGORY, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

---

Vacated and remanded by published opinion. Senior Judge Hamilton
wrote the opinion, in which Judge Widener and Judge Gregory joined.

---

## COUNSEL

William Henry Hurd, TROUTMAN SANDERS, L.L.P., Richmond,
Virginia, for Appellants. Joseph Thomas Tokarz, II, COUNTY
ATTORNEY'S OFFICE, Richmond, Virginia, for Appellee.

**OPINION**

HAMILTON, Senior Circuit Judge:

The present action arising under the Individuals with Disabilities Education Act (the IDEA), 20 U.S.C. §§ 1400 to 1487, involves a dispute regarding who should bear the expense of $1,875 in speech/language and occupational therapy services received by JH[1] during the summer of 2001, *i.e.*, the summer between JH's kindergarten and first grade school years.[2] JH suffers from a high functioning form of autism which is often referred to as Asperger's Disorder.

JH and his parents, JD and SS, (collectively the Plaintiffs), contend the IDEA statutorily obligates the School Board for Henrico County, Virginia (the County) to bear the expense of these services because they were necessary to prevent the gains that JH had made during his regular kindergarten school year from being significantly jeopardized. The Plaintiffs have already paid for such services and seek reimbursement from the County in this action. The Plaintiffs also seek attorney's fees and costs in the matter.

The County, in contrast, contends that the lesser amount of speech/language and occupational therapy services prescribed in the Individual Educational Program (IEP) that it proposed for JH for the summer of 2001, along with other services prescribed therein, met that goal and, therefore, it bears no reimbursement obligation and no obligation to pay the Plaintiffs' attorney's fees and costs in the matter.

The district court granted summary judgment in favor of the County. We vacate and remand for further proceedings consistent with this opinion.

---

[1]We refer to the child and the child's parents by their initials in order to protect the identity of the child.

[2]Specifically, JH received two hours of private speech/language therapy and two hours of occupational therapy each week during the summer of 2001.

# I

Before setting forth the relevant facts and lengthy procedural history of this case, an exposition of some pertinent statutory and regulatory background is in order. In general, the IDEA requires all states receiving federal funds for education to provide each child between the ages of three and twenty-one, who has a disability, with a free appropriate public education (a FAPE). 20 U.S.C. § 1412(a)(1)(A). Congress enacted the IDEA, in part, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." *Id.* § 1400(d)(1)(A). Significantly, however, while the IDEA requires states to "provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child," the IDEA "does not require the furnishing of every special service necessary to maximize each handicapped child's potential." *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997) (internal quotation marks and citations omitted).

The IDEA mandates that a school district receiving federal funds provide an appropriate IEP for each disabled child. *MM v. School Dist. of Greenville County*, 303 F.3d 523, 527 (4th Cir. 2002). "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *Id.* Every IEP is required to be prepared by an IEP team, which team consists of at least one representative of the school district, the child's teacher, the child's parents or guardian and, where appropriate, the child himself. 20 U.S.C. § 1414(d)(1)(B).

# II

There is no dispute that JH suffers from a high functioning form of autism which qualifies him as disabled under the IDEA. As we observed in *MM* with respect to another child suffering from autism:

> Autism adversely impacts the normal development of the
> brain in the areas of social interaction and communication

skills. Individuals suffering from autism experience, inter alia, preoccupation with inner thoughts, daydreams, and fantasies, and they have difficulty communicating.

*MM*, 303 F.3d at 527-28 n.6.

Despite suffering from autism, JH attended kindergarten in a regular classroom setting during the 2000-2001 school year. He did so at Dumbarton Elementary School (Dumbarton) under an agreed IEP with the County (the Kindergarten IEP). As required by the IDEA, the Kindergarten IEP set forth specific goals for JH to master by the end of his regular kindergarten school year. In order to meet these goals, which numbered twenty-seven, the Kindergarten IEP provided JH six hours per day of one-on-one services by an instructional assistant in addition to two hours of speech/language therapy per week (one hour one-on-one and one hour one-on-one/integrated)[3] and two hours of occupational therapy per week (thirty minutes one-on-one, thirty minutes one-on-one/integrated, and one hour integrated).

Nancy Smith (SLP Smith), a County employee and speech/language pathologist with twenty-eight years' experience, provided JH his speech/language therapy at Dumbarton, while Carolyn Stone (OT Stone), a County employee and occupational therapist with twenty-six years' experience, provided JH his occupational therapy at Dumbarton. During JH's regular kindergarten school year, SLP Smith and OT Stone each saw JH at least three times per week and talked regularly with his classroom teacher, Howard Everett (Teacher Everett), and the instructional assistant the County assigned to JH, Cara Phillips (Instr. Asst. Phillips).

Testing at the end of JH's regular kindergarten school year revealed that he had mastered three of the twenty-seven goals specified in the Kindergarten IEP and made progress in all but two of the others. Nonetheless, although JH had improved his skills with respect

---

[3]One-on-one therapy is where the therapist works directly with the student by him or herself, while integrated therapy is where the therapist works directly with the student in a small group of usually no more than three. It appears undisputed that both one-on-one therapy and integrated therapy are generally considered "direct" therapy services.

to using language appropriately in social situations, referred to as social pragmatics, he remained seriously behind his peers in that area. JH also remained seriously behind his peers with respect to handwriting skills.

Although children attending school in the County do not normally attend school during the summer, on June 11, 2001, the County members of JH's IEP team issued a final proposed IEP for JH for the summer of 2001 (the Summer 2001 IEP). In IDEA parlance, educational services provided to a disabled child during the summer in a school system where children do not normally attend school during the summer are called extended school year services (ESY Services). 34 C.F.R. § 300.309.

The Summer 2001 IEP provided that, while attending the regular ten week summer school session at Dumbarton, JH would receive: (1) thirty minutes per week for the entire summer school session of consultation between the special education teacher and the regular classroom teacher; (2) assistance from an instructional assistant three hours per day, four days per week from June 18 to June 29, 2001; (3) assistance from an instructional assistant four hours per day, four days per week from July 9 through August 2, 2001; (4) assistance from an instructional assistant three hours per day, five days per week from August 6 to August 18, 2001; (5) ten hours per week of special education from August 21 through September 1, 2001; (6) integrated speech therapy conducted in four thirty-minute sessions over the course of the summer (for a total of two hours); (7) direct occupational therapy conducted in five thirty-minute sessions over the course of the summer (for a total of two and one half hours); (8) three thirty-minute sessions of consultative occupational therapy[4]; and (9) four thirty-minute sessions of consultative speech therapy. The May 16, 2001, cover letter accompanying the Summer 2001 IEP that SLP Smith and OT Stone sent to the Plaintiffs stated, *inter alia*: (1) "[s]ocial language skills are best learned in social settings with peers"; (2) "[a]lthough handwriting is an area of weakness he seems to perform this activity best while in the classroom setting and not while

---

[4]In a consultative therapy session, the respective therapist consults with either the disabled child's special education teacher, his regular classroom teacher, his parents, or his instructional assistant.

under individual scrutiny"; (3) JH "needs to be with typically developing peers to work on social language and fine motor skills"; and (4) "[p]eer modeling with some direction from an instructional assistant under the direction of the speech pathologist and occupational therapist is appropriate to meet [JH's] needs." (J.A. 732).

The Plaintiffs objected to the Summer 2001 IEP on the ground that it provided JH inadequate amounts of direct speech/language and occupational therapy. The Plaintiffs wanted such therapy to continue at the same level as the Kindergarten IEP. In response, the County steadfastly adhered to the Summer 2001 IEP as best for JH. Based on SLP Smith and OT Stone's experience with JH during his regular kindergarten school year, both believed that JH had difficulty generalizing social language skills taught in one-on-one therapy sessions to other real life settings such as the classroom, the playground, and home. Therefore, rather than focusing on direct therapy services during the summer of 2001, SLP Smith and OT Stone believed that JH would best be served by receiving ESY Services focused on improving his peer communication skills.

When the County refused to amend the Summer 2001 IEP in response to their objection, the Plaintiffs made up the difference in speech/language and occupational therapy services at their own expense. Meanwhile, the Plaintiffs pursued their administrative remedies before a state administrative hearing officer (the Hearing Officer), *inter alia*, to obtain reimbursement from the County for the privately paid therapy services.

JH attended summer school at Dumbarton during the summer of 2001 with nine other non-disabled, rising first graders. Patricia King (Summer Teacher King) taught the summer school class in a general education classroom setting.

This case has been before the Hearing Officer twice. The first Hearing (Hearing I) was held on July 30, 2001 and concluded on August 6, 2001.

A.  *Hearing I*

Before the Hearing Officer in Hearing I, both sides offered several live witnesses and written evidence in support of their respective posi-

tions. The Plaintiffs offered the live expert testimony of Dr. Ronald David, M.D. (Dr. David, M.D. or Dr. David), Dr. Donald Oswald, Ph.D. (Dr. Oswald, Ph.D. or Dr. Oswald), and occupational therapist Gerri Allen (OT Allen). The County offered the live expert testimony of SLP Smith and OT Stone. JH's parents, Instr. Asst. Phillips, and Summer Teacher King also testified.

### 1. *Dr. David, M.D.*

Dr. David, M.D., an associate clinical professor of pediatrics at the Medical College of Virginia, is an expert in pediatric neurology and autism. He testified before the Hearing Officer and submitted a written report. Prior to preparing his report and/or testifying, Dr. David conducted an in-depth and lengthy interview of JH's mother regarding JH, personally examined JH for an hour and a half, reviewed JH's medical history, reviewed what appears to be all pertinent evaluations/reports prepared by County personnel regarding JH,[5] reviewed JH's IEPs through the Summer 2001 IEP, and reviewed the private evaluations/reports of JH prepared by JH's private therapists.

Dr. David testified that autism is a social learning disability. According to Dr. David, children with autism, "may have the words, they may have the lexicon, the internal dictionary, to be able to talk, but they can't, basically, put their thoughts into what we call pragmatic terms, that is, they cannot initiate or respond to who, why, when, how, where questions." (J.A. 106). Notably, Dr. David testified that children with autism have a profound ability to regress, and that if JH did not participate in "an intensive program" during the summer of 2001, "[h]e's going to regress," such that "you have to go back and reinvent the wheel, not completely, not from the ground up, but you are going to have to go back and basically retool." (J.A. 116). From the context of Dr. David's full testimony, it is clear that he is referring to an intensive program regarding pragmatic language skills. For Dr. David, the four hours per day, four hours per week of summer school provided in the Summer 2001 IEP would not be appropriate for JH unless a speech/language pathologist was in the classroom as a monitor.

---

[5]The County has not identified any document in JH's school file which it contends Dr. David should have reviewed but did not.

Dr. David also testified that children have a great window of opportunity for language learning that begins to close by age eight or nine, and thus, "if you mark time with a child who has autism, you lose. If you decelerate services, you lose. And that if you're going to make an impact, the only way to make an impact is to continually accelerate services within the child's limit of tolerance." *Id.*

### 2. *Dr. Oswald, Ph.D.*

Dr. Oswald, Ph.D., a licensed clinical psychologist who works exclusively with autistic children and adults at the Medical College of Virginia, is an expert in autism. He testified before the Hearing Officer and submitted a report.

Dr. Oswald had evaluated JH over the course of one year prior to the time the present dispute arose regarding the Summer 2001 IEP. In his report, Dr. Oswald opined that "[r]educing the frequency of related services represents a significant change and a threat to the progress that [JH] and his teachers have worked so hard to achieve." (J.A. 834). Similarly, Dr. Oswald testified that without receiving two hours of direct speech/language therapy and two hours of direct occupational therapy per week during the summer of 2001, JH "would not continue to develop and would likely experience regression . . . ." (J.A. 296). Notably, in his report, Dr. Oswald disagreed with the peer modeling approach recommended by SLP Smith and OT Stone as an appropriate approach for JH to learn pragmatic language skills. Dr. Oswald clearly stated in his report that "[c]hildren with Asperger's Disorder do not learn pragmatic language skills by exposure to typical peers or by participation in classroom group activities; they learn these skills by intensive individual instruction and by rehearsal, prompting, and reinforcement in individual and small group settings." (J.A. 835).

While Dr. Oswald did not observe JH in the school setting in formulating his conclusions, Dr. Oswald did perform clinical interviews of JH in his office on three occasions over the course of a year for a total of five hours. He also reviewed a battery of diagnostic/evaluative tests that had been administered to JH, as well as the other relevant information reviewed by Dr. David.

### 3. *OT Allen*

OT Allen, a licensed occupational therapist with twenty-six years' experience, served as JH's private occupational therapist beginning in 1999. In her testimony before the Hearing Officer, she recommended that JH continue to receive one-hour of direct occupational therapy two times per week for eleven weeks during the summer of 2001 so as not to regress. Besides observing JH in one-on-one occupational therapy sessions, OT Allen observed JH in two occupational group therapy camps in the summer of 2000. She reported that he did well in the camp with only five other children, but had much difficulty being in the camp with twelve other children. According to OT Allen, in the larger group, JH "became highly aroused, started a lot of behaviors of facial grimacing, anxious pacing, [and] pointing his finger at kids." (J.A. 156). Because JH could not satisfactorily function in the larger camp, OT Allen created and placed him in a three-child therapy group, supervised by two occupational therapists.

OT Allen also strongly disagreed with the peer modeling approach recommended by SLP Smith and OT Stone in the Summer 2001 IEP as the appropriate approach for JH to work on fine motor skills associated with occupational therapy for children such as handwriting and self-care. OT Allen based her disagreement on her professional opinion that JH is easily over stimulated in any setting other than one-on-one or small group, and he has no way to control his environment in the peer modeling approach espoused by SLP Smith and OT Stone. In OT Allen's view, the over stimulation significantly interferes with JH's ability to work on assigned tasks.

### 4. *Instr. Asst. Phillips*

The County assigned Instr. Asst. Phillips to JH six hours per school day during his regular kindergarten school year. Instr. Asst. Phillips testified before the Hearing Officer that after an interruption in JH's educational program such as Thanksgiving break, Christmas break, and illnesses, he suffered a "major loss" in his ability to perform. (J.A. 493). In regard to how long JH took to recoup from such a major loss, she testified that "[i]t varied. After Christmas break, it was about two months before his behavior started to get under control again." *Id.*

Regarding what type of adverse behavior he had for two months, she testified:

> Screaming, throwing things, hitting me, kicking at me, ripping up paper, getting up and running out of — away from me at different points in time. Pretty much everything you can imagine, short of — he never bit. He's not a biter. But he would sometimes be aggressive towards me. He would often be self-aggressive, scratching himself, hitting himself, banging his head against the wall, poking at his eyes. And, at times, it got so bad that I took him out of the classroom and did all of his work in the room that we worked in the afternoon. So there were times where he wasn't in the classroom pretty much the entire day.

(J.A. 493-94).

Inst. Asst. Phillips also reported that, based upon her observations, JH's behavior is generally better in a one-on-one session than in a group. She explained what often happened with JH in group sessions with the County's therapists:

> Often times in groups, [JH] would get very agitated. He would use inappropriate language. He would do this little hand thrust thing that he does when he's very angry. Several times he would have to be asked to sit down, away from the table, away from the group, because he couldn't participate in the activities.

(J.A. 485).

At the time of her testimony, Instr. Asst. Phillips was employed at the Virginia Autism Center. She holds a bachelor of science degree from William and Mary, where she graduated *cum laude*. Prior to being assigned to JH, she had worked with other autistic children in Massachusetts as well as Richmond, Virginia.

### 5. *SLP Smith*

SLP Smith, a speech/language pathologist with twenty-eight years' experience, provided JH his speech/language therapy at Dumbarton

during his regular kindergarten school year. Thus, during JH's regular kindergarten school year, SLP Smith saw JH at least three times per week and talked regularly with Teacher Everett and Instr. Asst. Phillips.

SLP Smith testified before the Hearing Officer that, in the area of pragmatic language skills, JH

> needs to learn in a small group setting of his peers. His deficit is in social pragmatics, that is, the interaction with other people. He does — I think he's been working with adults for so long, he needs now to learn how to work with his peers. That's my area of concern, that he needs to work more with his peers.

(J.A. 368).

According to SLP Smith, JH needs to interact with his peers "in a natural setting," because he lacks the ability to generalize, *i.e.*, to take what he has learned in one-on-one therapy sessions and apply it in other settings such as the classroom, playground, or cafeteria. (J.A. 340). Notably, SLP Smith testified that it was not her position that JH learned more or responded better in a group of peers rather than in a one-on-one session with an adult.

On the issue of actual progress during the summer of 2001, SLP Smith testified that, as of July 30, 2001, she had witnessed JH undergo "an amazing growth" in social pragmatics. (J.A. 350). She based her opinion on three thirty-minute integrated speech/language sessions that she had with JH in the classroom and an unspecified amount of time that she spent observing JH in the school cafeteria and on the playground.

### 6. *OT Stone*

OT Stone, an occupational therapist with twenty-six years' experience, provided JH his occupational therapy services at Dumbarton during his regular kindergarten school year. Thus, during JH's regular kindergarten school year, OT Stone saw JH at least three times per

week and talked regularly with Teacher Everett and Instr. Asst. Phillips.[6] Before the Hearing Officer, OT Stone was qualified as an expert in occupational therapy in working with autistic children.

OT Stone concurred in the recommendation for peer modeling and testified that JH works best in the classroom "which is the natural setting for him," that he needs to practice and reinforce what he has been taught in all settings, and that he does not need an occupational therapist while he does so. (J.A. 418). According to OT Stone, after holiday breaks, JH only had a day or two where he had a difficult time performing to his maximum potential. On the issue of whether JH made actual progress in his occupational therapy skills during the summer of 2001, OT Stone testified that she had seen progress in JH's handwriting, drawing, and cutting skills.

### 7.  *Speech/Language Pathologist Lisa Wright*

As part of their case, the Plaintiffs offered a report by Lisa Wright, JH's private speech/language pathologist. Lisa Wright (SLP Wright) based her conclusions on twelve years' experience as both a clinical and school-based speech/language pathologist, her experience working with JH twice a week since March 1998, her testing of JH, and her review of various documents about JH from the County, including the separate spring 2001 evaluations of JH conducted by SLP Smith and OT Stone. According to SLP Wright, "[JH] has shown a marked tendency to regress during previous breaks in services and, without an intensive ESY program, he will definitely experience substantial regression over the summer." (J.A. 730).

SLP Wright regarded the Summer 2001 IEP as inadequate in the area of speech/language. She recommended that JH receive "not less than 16 sessions of speech therapy (at least 45 minutes each) over the 11 weeks of summer vacation" (compared to the 2 hours proposed by the County). *Id.* Notably, while this was less than the number of hours sought by the Plaintiffs, SLP Wright premised her lower recommendation on the condition that services from the County would be supplemented by JH's parents.

---

[6]OT Stone had also provided JH occupational therapy services at Kiddie Company during the 1999-2000 school year.

8. *Special Education Teacher Helen McGrath*

The plaintiffs also submitted a questionnaire (the ESY Questionnaire), completed by Helen McGrath, entitled "CONSIDERATION FOR EXTENDED SCHOOL YEAR (ESY) Henrico County Public Schools." (J.A. 998). As Dumbarton's special education teacher, Helen McGrath (SET McGrath) was responsible for completing the questionnaire. Although SET McGrath did not actually teach JH, per the Kindergarten IEP, she did provide Teacher Everett and Instr. Asst. Phillips with one hour each week of special education consulting services regarding JH. SET McGrath reported on the ESY Questionnaire that Teacher Everett and Instr. Asst. Phillips both reported that JH experienced "loss of social skills as well as performance after absences." (J.A. 999).

The ESY Questionnaire expressly states:

Extended school year (ESY) is designed to provide a free appropriate public education to children with disabilities who experience significant regression of critical life skills because of an interruption in the instructional program. The information you provide below will assist in determining whether the above named student qualifies for ESY.

(J.A. 998). Of relevance to the *MM* standard for ESY Services, the questionnaire asks "[w]hat previous interruption in the educational program has caused a permanent, irreparable or major loss in this student's ability to perform?" (J.A. 999). McGrath answered: "Christmas - Thanksgiving [-] after illness. [JH] has great difficulty reorienting to the school environment, structure, and social settings. He seems to have anxiety, difficulty transitioning, and general performance in school setting." *Id.* The questionnaire also asks: "What permanent, irreparable or major loss of critical life skills will occur as a result of interruption of this student's education?" *Id.* SET McGrath answered: "Emerging communication, social, behavioral (sensory) skills, cognitive skills[, and] fine motor skills." *Id.*

9. *Summer Teacher King*

Summer Teacher King testified before the Hearing Officer that JH was doing well in the classroom with ten children, but had a hard time

with the larger group of children on the playground. She reported that she had seen improvement in JH's social pragmatic and occupational skills over the time during which she had taught him, which was four hours per day for twelve days spread over a three week period.

### 10.   *Conclusion of Hearing I*

Following the contested hearing on the appropriateness of the Summer 2001 IEP, the Hearing Officer ordered the Summer 2001 IEP amended to provide JH with two hours of speech/language therapy per week and two hours of occupational therapy per week. He also ordered that the stated goal of the Summer 2001 IEP be amended from "'maintaining'" to "'making reasonable progress.'" (J.A. 529). The Hearing Officer did not actually address the reimbursement issue.

### B.   *Disposition of the District Court The First Time*

The case then came before the district court, which overturned the Hearing Officer's decision and entered judgment in favor of the County. The Plaintiffs appealed.

### C.   *Disposition of the Fourth Circuit The First Time*

On appeal, we vacated the district court's judgment in favor of the County and remanded the case to the district court with instructions to further remand the case to the Hearing Officer for a finding as to whether the level of services provided in the Summer 2001 IEP was adequate to prevent the gains that JH had made in his speech/language and occupational skills during his regular kindergarten school year from being significantly jeopardized. *See JH v. Henrico County Sch. Bd.* (*JH I*), 326 F.3d 560 (4th Cir. 2003). The remand was necessitated by issuance of our decision in *MM*, 303 F.3d at 523, of which neither the Hearing Officer nor the district court had the benefit at the time of their respective decisions. In *MM*, the Fourth Circuit announced, for the first time, a formal standard for determining when a school district is obligated to provide ESY Services to a disabled child. *Id.* at 538.

### D.   *Hearing II*

On remand, the Hearing Officer held a hearing in August 2003 in which he did not hear or consider any new evidence, but did consider

new written and oral arguments. On October 29, 2003, the Hearing Officer issued his written opinion on remand, again ruling in favor of the Plaintiffs. The thirteen page opinion first sets forth background information regarding the case in general and then background information specifically regarding JH. The opinion is then broken down into two separate substantive sections, a conclusion, and a section entitled "*ORDER*." (S.J.A. 95).

The first substantive section outlines, in considerable detail, the evidence before the Hearing Officer on the question of whether the level of services provided in the Summer 2001 IEP was adequate to prevent the gains that JH had made in his speech/language and occupational skills during his regular kindergarten school year from being significantly jeopardized. In the second substantive section, the Hearing Officer, as we instructed in *JH I*, addressed the "window of opportunity" evidence presented by the Plaintiffs. The Hearing Officer explained that in discussing JH's "window of opportunity" for language learning, Dr. David did not engage in "an effort to maximize the efforts of the school system in providing services." (S.J.A. 94A). Rather, according to the Hearing Officer, such discussion "is an effort by the medical field, specializing in the study of the brain, or neurology and autism, to explain to the school system when the brain of an autistic child is most receptive to receive and retain the basic information that the school system is providing to the autistic child." *Id.*

In conclusion, the Hearing Officer declared that *the County had the burden of proof*, and that, "[a]fter careful review of all the evidence, it [was his] judgment that the County has not carried the burden of proving that the ESY 2001 IEP was appropriate for the needs of this student to prevent regression during the summer months and to prevent the gains that he made during the regular kindergarten year from being significantly jeopardized."[7] (S.J.A. 95). In the "*ORDER*" sec-

---

[7]At the time of the Hearing Officer's second opinion, which party had the burden of proof in an IDEA case was an open question in our circuit. Nine months later, we answered that question in *Weast v. Schaffer*, 377 F.3d 449 (4th Cir. 2004), *petition for cert. filed*, 73 U.S.L.W. 3338 (U.S. Nov. 19, 2004) (No. 04-698). In *Weast*, we held that, under the IDEA, parents, not the school system, bear the burden of proof in a state administrative proceeding initiated by the parents to challenge the substantive adequacy of an IEP. *Id.* at 455-56.

tion, the Hearing Officer ordered the County to amend the Summer 2001 IEP to provide JH with two hours of speech/language therapy per week and two hours of occupational therapy per week on the ground that such services were "necessary to prevent the gains that J[H] made during the regular kindergarten school year from being significantly jeopardized." *Id.*

E.   *Disposition of the District Court The Second Time*

Following issuance of the Hearing Officer's opinion on remand, the Plaintiffs filed the present complaint in the district court for reimbursement of the $1,875 they had spent to provide JH private speech/language and occupational therapy services in the summer of 2001. The complaint also sought attorney's fees and court costs in the matter.

The County filed a counterclaim asking the district court to reverse the Hearing Officer and enter final judgment for the County. The Plaintiffs moved to dismiss the County's counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Alternatively, the Plaintiffs moved for summary judgment on the counterclaim. The County also filed a motion for summary judgment on its counterclaim and for final judgment on remand. Neither party introduced new evidence before the district court.

Ruling from the bench, the district court denied the Plaintiffs' Rule 12(b)(6) motion and their alternative motion for summary judgment on the County's counterclaim and granted the County's "motion for final judgment on the remand and for summary judgment." (S.J.A. 187). From the bench, the district court gave the following reasons, *inter alia*, for its rulings: (1) the Hearing Officer did not adequately, if at all, consider the testimony of SLP Smith and OT Stone, who had worked extensively with JH during the regular kindergarten school year, including observing and sometimes working with JH in the classroom setting, and whose opinions as professional educators are owed deference under the law; (2) the Hearing Officer failed to expressly recognize that none of the Plaintiffs' experts had worked with or observed JH in the classroom setting at Dumbarton; and (3) the Hearing Officer failed to take into account the effect of the other ESY Services provided JH in the Summer 2001 IEP.

In its final comments from the bench, the district court stated that, for the reasons that it stated from the bench and for the sake of judicial economy, a remand to the Hearing Officer to correct the flaws in his opinion was inappropriate. On March 17, 2004, the district court entered a final order memorializing his oral rulings.[8] The Plaintiffs filed a timely notice of appeal.

### III

Here, we are called upon to review the propriety of the district court's grant of summary judgment in favor of the County. Unlike the familiar *de novo* standard of review that we apply in the vast majority of summary judgment cases, *MM* teaches that, in reviewing a district court's grant of summary judgment in an IDEA case, we are "obliged to conduct a modified de novo review, giving due weight to the underlying administrative proceedings." 303 F.3d at 530-31 (internal citation marks omitted). *See also id.* at 533 (stating that, in IDEA cases, "[t]he courts should, to the extent possible, defer to the considered rulings of the administrative officers . . . ."). This means that we must consider any findings of fact made by the Hearing Officer to be *prima facie* correct. *Id.* at 531.

"Whether a district court has accorded the proper due weight to the administrative proceedings is a question of law—or at least a mixed question of law and fact—to be reviewed de novo by an appellate court." *Id.* (internal quotation marks omitted). We review all findings of fact made by the district court based upon its hearing and consideration of additional evidence for clear error; otherwise, we afford no deference to factual recitations made by the district court. *Id.* This is because the district "court stands in no better position than do we in reviewing the [administrative] record." *Id.*

---

[8]Although the district court's final order does not specifically address the Plaintiffs' reimbursement claim, when read in context, it is clear to us that the district court entered judgment in favor of the County with respect to that claim as well.

IV

On appeal, the Plaintiffs challenge the district court's grant of summary judgment in favor of the County. Unfortunately, the present posture of this case prevents us from reaching the merits of the Plaintiffs' challenge. Unbeknownst to the Hearing Officer and the parties at the time of the administrative hearing on remand, the Hearing Officer erroneously placed the burden of proof on the County. Under our recent decision in *Weast*, issued long after the conclusion of proceedings in this case below, the Hearing Officer should have placed the burden of proof on the Plaintiffs. 377 F.3d at 455-56. Thus, the Hearing Officer's opinion on remand does not contain a finding on the critical issue necessary to resolving this case, that is, with the Plaintiffs bearing the burden of proof in support of their position, whether the level of services provided in the Summer 2001 IEP was adequate to prevent the gains that JH had made with respect to his speech/language and occupational skills during his regular kindergarten school year from being significantly jeopardized. Rather, the Hearing Officer's opinion on remand only concludes that *the County failed to prove* that the level of services provided in the Summer 2001 IEP were adequate to prevent the gains that JH had made during his regular kindergarten school year from being significantly jeopardized.[9]

We expressly recognized in *MM* that "a disabled child's need for ESY Services may be established by expert testimony, based on a professional individual evaluation." 303 F.3d at 538. As we observed in *JH I*, "the record [in this case] indeed does contain conflicting evidence regarding whether the level of services provided in the Summer

---

[9]Based upon the law of the case doctrine, the Plaintiffs contend that the County cannot take advantage of our *Weast* decision because, in *JH I*, this court did not reverse the Hearing Officer's placement of the burden of proof on the County during the first hearing. The Plaintiffs' reliance on the law of the case doctrine under these circumstances is misplaced. The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). Significantly, we did not decide in *JH I* which party, the Plaintiffs or the County, should bear the burden of proof. Accordingly, the law of the case doctrine is inapplicable.

2001 IEP was adequate to prevent the gains that JH made during his regular kindergarten school year from being significantly jeopardized." 326 F.3d at 568. Because resolution of such conflicting evidence, much of which is in the form of expert testimony and reports, depends greatly upon nuanced credibility determinations, which we are not at liberty as a federal appellate court to make, no clear outcome is apparent to us regardless of which party bears the burden of proof. Accordingly, we have no choice but to remand all the way back to the Hearing Officer for a reweighing of the evidence under the correct burden of proof allocation—*i.e.*, the parents bearing the burden of proof. *Cf. Butler v. Secretary of Health and Human Servs.*, 850 F.2d 425, 426-27 (8th Cir. 1988) (remand to ALJ in social security case necessary because ALJ, as fact finder, improperly allocated the burden of proof in case where outcome was not clear regardless of which party had burden of proof); *Otto Gerdau Co. v. Lambert's Point Docks, Inc.*, 733 F.2d 343, 345 (4th Cir. 1984) (judgment following bench trial by district court required to be vacated and the case remanded for further consideration because district court erroneously allocated burden of proof).

Having decided to remand this case a second time, we deem it wise to set forth detailed instructions for the Hearing Officer to follow on remand, not only to aid the Hearing Officer's decisional process, but to aid in any potential appellate review.

First, in crediting the testimony of any witness, the Hearing Officer must explain *why* it chose to do so over conflicting testimony by another witness. In this regard, the Hearing Officer should be especially concerned with explaining why he may choose to credit the testimony of one of the Plaintiffs' expert witnesses over SLP Smith or OT Stone, whose professional opinions as local educators regarding the adequacy of the Summer 2001 IEP are entitled to deference, *MM*, 303 F.3d at 532-33. Additionally, if the Hearing Officer chooses to credit the testimony of any witness who did not actually observe JH in the school setting, the Hearing Officer needs to expressly acknowledge such fact and explain why he chose to credit that witness's testimony anyway. The same goes for the crediting of any expert reports.

Second, in making its finding on the ultimate question upon which we are remanding for a finding, with the Plaintiffs bearing the burden

of proof, we instruct the Hearing Officer to take into account any educational benefit the record shows that JH would receive in the areas of speech/language and occupational skills from the ESY Services provided in the Summer 2001 IEP.

Third, we instruct the Hearing Officer to specify any and all evidence (subjective and/or objective) regarding actual progress made by JH in his speech/language and occupational skills during the summer of 2001 and to state whether he gave such evidence any weight in making his ultimate finding, and if not, why.

Finally, the Hearing Officer, as it did in its October 29, 2003 opinion on remand, should explain the relevancy, if any, of the "window of opportunity" evidence presented by the Plaintiffs to the question of whether the Summer 2001 IEP was adequate to prevent the gains that JH had made in his speech/language and occupational skills from being significantly jeopardized.

V

We recognize and sincerely regret that our disposition further exacerbates an already protracted litigation process. Nevertheless, under the circumstances, such consequence is unavoidable. Accordingly, we vacate the judgment entered by the district court in favor of the County, remand to the district court with instructions to again remand the case to the Hearing Officer. On remand before the Hearing Officer, we instruct the Hearing Officer, per our detailed instructions in part IV, to reweigh the evidence *with the burden of proof on the Plaintiffs* and answer the question of whether the level of services provided in the Summer 2001 IEP was adequate to prevent the gains that JH had made with respect to his speech/language and occupational skills during his regular kindergarten school year from being significantly jeopardized.[10]

*VACATED AND REMANDED*

---

[10]To ensure that the Hearing Officer on remand has a complete understanding of our remand instructions, we recommend the district court attach a copy of this opinion to its order remanding the case to the Hearing Officer.