742 F.2d 825
 19 Ed. Law Rep. 935
 David Bruce MATTHEWS, an infant who sues by his mother and
next friend, Elizabeth J. MATTHEWS, Appellant,
v.
Dr. S. John DAVIS, in his official capacity as
Superintendent of Public Instruction, Virginia Department of
Education, Howard O. Sullins, individually, and in his
official capacity as Division Superintendent, Chesterfield
County Public Schools, C.E. Curtis, Jr., G.R. Partin, John
S. Harvie, III, A. Perry Strickland, III, E.A. Moseley, Jr.,
each in his or her capacity as members of the Chesterfield
County School Board, Appellees.
 No. 83-1594.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 11, 1984.
Decided Aug. 30, 1984.
 
 John F. Rick, Manassas, Va. (Christopher M. Malone, Thompson & McMullan, Richmond, Va., on brief) for appellant.
 Oliver D. Rudy, Chesterfield, Va. (Rudy, Gill & Keown, Chesterfield, Va., David R. Johnson, Williams, Mullen & Christian, Phyllis C. Katz, Asst. Atty. Gen., Richmond, Va., on brief), for appellees.
 Before RUSSELL and WIDENER, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 WIDENER, Circuit Judge:
 
 
 1
 Appellant David Bruce Matthews, by his mother Elizabeth J. Matthews, appeals from an order of the district court which released the Chesterfield County public school system from its obligation under a previous order of the district court to provide 24-hour residential care and education for David, a severely handicapped child, as a part of his educational program. We affirm the judgment of the district court, and make only a slight alteration in its terms not touching the merits of the case.
 
 I.
 
 2
 David, born October 25, 1966, is a severely and profoundly retarded child. He has an approximate IQ of eleven and a mental age of about 14 months. In addition to mental retardation, he suffers from myoclonic seizures, both grand and petit mal, which are somewhat controlled by medication.
 
 
 3
 David is a handicapped child within the meaning of the Education for All Handicapped Children Act of 1975, as amended, 20 U.S.C. Sec. 1400 et seq. (the Act), 29 U.S.C. Sec. 794, and the Virginia Code Sec. 22.1-213 et seq., and 34 C.F.R. Sec. 300.550 et seq. These statutory and regulatory provisions oblige the State's public schools to provide David a "free appropriate public education" in the "least restrictive environment."
 
 
 4
 From May 1973 until August 1977, David's family lived in Missouri, where the local school system chose to meet its educational obligations by placing David in Woodhaven Learning Center, a residential institution. In August 1977, David's family moved to Chesterfield County, Virginia. He entered the upper developmental class for severely and profoundly retarded children at the Hening Elementary School in October 1977 for observation and evaluation. At that time, the school system undertook to develop an individualized education plan, as required by the Act, tailored to David's ability to learn. 20 U.S.C. Secs. 1401(19), 1412(4).
 
 
 5
 David's program, reviewed at the beginning of each school year and at least annually to report progress and revise goals, consists of a list of tasks he is considered capable of learning, such as sorting objects, learning to say simple words, lowering and raising pants, use of toilet, eating with a fork, toothbrushing, taking off his coat, hat or undershirt, putting on his coat or shirt, washing hands, and pouring milk, a multiplicity of simple tasks performed in response to verbal cues, David being capable of very little self-initiation. These goals are designed to give David some independence from caretakers. Reports on the program on a percentage basis show varying success. There is improvement from year to year and new tasks are added, although some are dropped because of lack of success. Many of the specific goals have not changed, either because the task has not been mastered, or because David will lose the skill unless it is retained in his program.
 
 
 6
 In December 1977, the Chesterfield County Special Education Committee recommended David continue in the upper developmental class at Hening, although his parents stated a preference for a program that provided 24-hour intervention. A subsequent application for tuition assistance to place David in a private school was denied by the Committee because it concluded the Hening program could meet David's needs. The parents appealed the Committee's decision unsuccessfully, first to the local school board and subsequently to the Superintendent of Public Education of the Commonwealth. The State concurred in the Committee's decision that David would receive an appropriate education at Hening, while living at home with his parents.
 
 
 7
 Upon the exhaustion of the state administrative procedures, this action was instituted in federal district court under the Act, 29 U.S.C. Sec. 794, and 42 U.S.C. Sec. 1983. Jurisdiction was found by the district court under 20 U.S.C. Sec. 1415(e)(4). The Matthews requested the district court to reverse the previous administrative decisions and to issue both preliminary and permanent injunctive relief requiring the defendants[1] to provide appropriate residential placement for David. By order filed December 22, 1978, the request for injunctive relief was denied although the court retained jurisdiction over the case until its further order.
 
 
 8
 On January 13, 1979, the district court issued a ruling from the bench in which it concluded that the education being offered David was not "appropriate" under the Act and state statutes in that David was making very little progress at Hening and the 5 hour/day program was apparently insufficient to teach him the basic functional skills listed in his individualized plan. The district court gave the school district ninety days to restructure or redesign David's program, with specific directions to, at a minimum, lengthen his daily program until 6:00 p.m. on weekdays and to incorporate a toilet training program. The court also recommended the employment of an advisory panel of experts to review David's program and generally assist the school system in the matter.
 
 
 9
 In a First Supplemental Memorandum issued July 16, 1979, the district court, based on its review of data submitted by the parties on David's further progress and modifications of his program, concluded that the program had failed to make sufficient progress. The court noted that this conclusion was not based on any lack of diligence on the part of the defendants and indeed praised the defendants' efforts. However, reluctantly, the court found no meaningful progress had been made or seemed likely, and ordered the defendants to find or develop an appropriate residential program. Mindful of the possibility that David's handicaps could be a complete barrier to training regardless of his situation, the court set a minimum of six months' duration in a residential program after which it would again review David's progress.
 
 
 10
 After extended investigation and consultations among the parties and the court in which more than thirty out-of-state as well as domestic residential institutions were considered and evaluated, the defendants proposed several residential options to the district court, acknowledging at the same time that one element of David's progress, toilet training, should be implemented in a full-time program. From the list of options presented, the court, by order dated January 8, 1980, approved the placement of David in Chesterfield Option C, in which the school system arranged the rental of a residential apartment which was staffed by school personnel, with continuing attendance in the day program at Hening. That option, as did the others presented, included a full time toilet training program of short duration administered by experts. The court again retained jurisdiction and received regular reports on David's progress.
 
 
 11
 When David was successfully toilet trained,[2] the school system, arguing that this was the sole element of David's progress that merited a 24-hour program, applied to the court to terminate the residential placement. After a hearing on September 28, 1981, the district court, heartened by this indication that David was indeed trainable when consistent professional care was available, ordered the residential program continued. A Memorandum and Order confirming his oral ruling was issued August 25, 1982.
 
 
 12
 However, since a year had passed between the hearing and the order, during which time the Supreme Court had addressed the subject for the first time,[3] the district court in that order offered the parties the opportunity to be heard again.
 
 
 13
 A new motion to terminate David's residential program was heard on June 3, 1983. This time the district court was persuaded that, although substantial progress had been achieved with the program, maintenance of the advances David had made and acquisition of the few additional skills of which he is considered capable could be accomplished without a residential program, which at that time was performing primarily custodial, not educational, functions.
 
 
 14
 In essence, the court found that an "appropriate" educational program for David no longer required residential placement and, that being true, it should not substitute its judgment for the school system's judgment on methodology under Hendrick Hudson District Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). A formal order dismissing the case, based on reasons stated from the bench, was issued June 14, 1983, from which this appeal was taken.
 
 II.
 
 15
 The sole issue presented on appeal is whether the school system's proposed program of day school at Hening and living at home constitutes the "free appropriate public education" David is entitled to under the Act, which is precisely the issue analyzed by the Supreme Court in the Rowley case.
 
 
 16
 The Act and regulations issued thereunder require school districts receiving federal funding to provide a "free appropriate public education" in the "least restrictive environment" to handicapped children between the ages of 3 and 21. The Virginia Code, Sec. 22.1-213 et seq. formally incorporates those requirements into state law. The school's obligations include evaluation of each handicapped child in its care and the development of an individualized plan to tailor the free appropriate public education to the unique needs of the child.
 
 
 17
 Until the Supreme Court's decision in Rowley, the meaning of "appropriate" in the Act had not been defined by the Court. In Rowley, the parents of a hearing-impaired child sought to use the Act to require a public school to provide a sign language interpreter in their child's classroom. The evidence showed the school had provided a hearing aid and speech therapy and that the child performed above the average in her class, although she would probably perform even better with an interpreter. 458 U.S. at 184, 102 S.Ct. at 3039.
 
 
 18
 The Supreme Court rejected the holdings of both the district court and of the court of appeals, which had ordered the school to provide an interpreter. The Court found that in formulating the Act Congress was concerned with the large number of handicapped children completely excluded from the system of public education, and sought to secure entry for them into the system by means of the statute. Id. at 189-90, 191-92, 198-99, 102 S.Ct. at 3041-42, 3042-44, 3046-47. The Court concluded that in this context the special educational services to be provided to handicapped children must be designed to meet their unique needs, and should permit such children to benefit from the instruction to constitute a "free appropriate public education," but need not assure maximization of a handicapped child's potential. Id. at 192, 195, 198, 102 S.Ct. at 3043, 3045, 3046. On these grounds, the sign language interpreter, requested to improve the performance of a child already receiving special educational and related services and benefitting from the education provided, was held not required by the Act. Id. at 203, 102 S.Ct. at 3049. The inquiry in each case, the Court said, was whether the procedures required by the Act had been followed, and whether the individualized educational program was "reasonably calculated to enable the child to receive educational benefits?" 458 U.S. at 207, 102 S.Ct. at 3051.
 
 
 19
 Thus, the inquiry in our case, there being no contest made of compliance with the procedures required by the Act, is whether David's individualized plan is reasonably calculated to enable him to receive educational benefits. Rowley, 458 U.S. at 206-7, 102 S.Ct. at 3050-51. The Supreme Court, although acknowledging that the district court has the authority to make its decision based on the preponderance of the evidence, did not read this as an authorization for the courts to substitute their own views on educational policy for those of the school authorities. Id. at 206, 102 S.Ct. at 3050. The primary responsibility for formulating the education to be accorded the handicapped child and for choosing the methods most suitable to the child's needs and abilities was left by the Act to the state and local school authorities. 20 U.S.C. Sec. 1412(a)(3); Rowley, 458 U.S. at 207-8, 102 S.Ct. at 3051-52.
 
 III.
 
 20
 The district court's order to establish a residential program for David was entered before the Supreme Court's decision in Rowley. While no issue is now made of its entry, we should comment that the order was entirely consistent with Rowley, for it was necessary for David to receive any benefits of the type sought. Accord, Abrahamson v. Hershman, infra.
 
 
 21
 However, we find ourselves in agreement with the district court that David's individualized plan no longer requires a residential program. Under Rowley the school system's obligation is to provide personalized instruction with sufficient support services to enable David to benefit educationally. As currently defined, David's individualized plan satisfies these requirements, with the sole controversy being whether its goals can be attained without a residential program. If the school system can supply an appropriate education in a day-only program, further enhancement is not required. See Hessler v. State Board of Education of Maryland, 700 F.2d 134 (4th Cir.1983) (availability of a better private program does not render inappropriate an otherwise sufficient public school program). See also Abrahamson v. Hershman, 701 F.2d 223, 227 (1st Cir.1983) (affirming as not clearly erroneous a district court's finding that a residential program was necessary to provide any educational benefits).
 
 
 22
 The testimony of David's teacher, caretaker (who kept the home in which David lived) and the school system's special education director at the June 1983 hearing is virtually uncontradicted in its observations about David's current program needs. David's caretaker and his neurologist, Dr. David, by a deposition introduced by the Matthews' attorney, stated that although David has improved significantly during his residential placement, he has probably reached a point of diminishing marginal returns and would not be able to learn much more. The school's witnesses were in agreement that reinforcement of David's skills through functional applications at home, along with continued training and drills at school, would be sufficient to maintain David's current skills. They also testified that the cues David had learned for those skills could easily be taught to his family. Although the residential program still incorporates 1 1/2 to 8 1/2 hours/week of drills, the school's witnesses agreed that David's living in the rented apartment had become primarily custodial and that such drills were not necessary to maintain his acquired skills.
 
 
 23
 The only witness offered by the Matthews',[4] Dr. David, suggested only one objection to the individualized plan. He stated he thought it might be possible to teach self-initiation of toilet use, which would require continuation of the 24-hour program, yet he could not be reasonably certain of this. The other witnesses, representing the school authorities' views in this matter, and their own views from actual experience training David, maintained that David was unlikely to ever be able to acquire the skills required to self-initiate toilet use. They stated his mental age is too low to allow him to recognize all of the factors that go into self-initiation; his poor manipulative skills will always leave him dependent upon a caretaker for assistance with his trousers; and implementation of such a program carries a substantial risk of regression (acknowledged by Dr. David) which might destroy his current level of toilet training. Indeed, any change in David's routine involves a certain amount of risk, as experience with small children shows.
 
 
 24
 In substance, at the last hearing before the district court the evidence before the court from witnesses equally qualified was all to the effect that David had reached the point in his education at which a continuation of the residential program would at best yield only marginal returns and probably none at all. The witnesses were disagreed only on one essential part of the program. The school's witnesses were of opinion that David should not be subjected to a further intensive toilet training program in an effort to get him to self-initiate. They felt the chance of success was small and the risk of regression was too great to take the risk. David's physician felt that the risk should be taken and the intensive toilet training program stopped if he began to regress. On this state of facts, the district court decided to discontinue the residential program which would leave, in effect, however, the individualized educational program for David in its other respects.
 
 
 25
 The finding of the district court in that respect was best summarized by it at its hearing on a stay only shortly after the entry of the order appealed from:
 
 
 26
 "We are here on a motion to stay the Court's order of June 14 wherein the Court ordered the infant plaintiff returned, really, to his own home, and that the school give him such education as the plan called for, except for the custodial care. I didn't think it was necessary for the custodial care. I think the child had done as well as could be expected, and whatever can be done in the home outside of the school can be done just as easily by his parents, or someone else, in the least restrictive place, which is his home."
 
 
 27
 We are of opinion the finding of the district court was not clearly erroneous. FRCP 52(a). It saw some of the witnesses and heard them testify. It had lived with the case through a multitude of hearings, orders, etc., for a period of five years, and its sensitive, systematic and thorough treatment of the parties and the issues in the case from beginning to end is a model. It was in a far better position than are we to make an adjudication as to whatever slight conflict there was in the evidence.
 
 
 28
 We make only one slight change in its order. We think the order should provide that the case, although dismissed, may be reinstated on the docket for good cause shown.
 
 The judgment of the district court is
 
 29
 AFFIRMED AS MODIFIED.
 
 
 
 [1]
 The Superintendent of the Department of Education for the Commonwealth of Virginia, Division Superintendent of Schools for Chesterfield County, and members of the county school board
 
 
 [2]
 Success in this instance means that David will respond to a verbal cue to "go to the bathroom." Although he will always need assistance with the fastenings of his trousers, his increased bladder control and the program of regular periodic bathroom visits are a significant improvement
 
 
 [3]
 Hendrick Hudson District Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)
 
 
 [4]
 A stipulation of facts was also filed