COUNTY SCHOOL BOARD OF HEN-
RICO COUNTY, VIRGINIA,
Plaintiff–Appellee,

v.

Z.P., a minor by and through his
parents and next friends; R.P.;
N.M.P., Defendants–Appellants.

No. 03–2338.

United States Court of Appeals,
Fourth Circuit.

Argued: Sept. 29, 2004.

Decided: Feb. 11, 2005.

**ARGUED:** Cassie R. Craze, Natasha Umbertis, University of Richmond, School of Law, Disability Law Clinic, Children's Law Center, Richmond, Virginia, for Appellants. Joseph Thomas Tokarz, II, Assistant County Attorney, County of Henrico, Richmond, Virginia, for Appellee. **ON BRIEF:** Adrienne E. Volenik, Director, Disability Law Clinic, Joanne V. Stanley, Third Year Law Student, University of Richmond, School of Law, Children's Law Center, Richmond, Virginia, for Appellants. Joseph P. Rapisarda, Jr., County Attorney, County of Henrico, Richmond, Virginia, for Appellee.

Before WIDENER, TRAXLER, and GREGORY, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge WIDENER joined. Judge GREGORY wrote a dissenting opinion.

## OPINION

TRAXLER, Circuit Judge:

Z.P. is a young boy with autism. Pursuant to its responsibilities under the Individuals with Disabilities Education Act ("IDEA"), the County School Board of Henrico County, Virginia, formulated an individualized education plan for Z.P. for the 2002–03 school year. Z.P.'s parents believed the plan to be inadequate and they rejected it, choosing instead to leave Z.P. in private school. The parents initiated a state administrative action seeking to require the School Board to pay the costs of Z.P.'s private placement. The state hearing officer ruled in favor of the parents, and the School Board challenged that decision in federal district court. The district court rejected the analysis of the hearing officer, granting summary judgment in favor of the School Board. The parents appeal. We reverse and remand with instructions that the district court reconsider the question of the appropriateness of the individualized education plan proposed for Z.P.

I.

A.

Congress enacted the IDEA, in part, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to

meet their unique needs and prepare them for employment and independent living." 20 U.S.C.A. § 1400(d)(1)(A) (West 2000). Accordingly, the IDEA requires all states receiving federal funds for education to provide disabled schoolchildren with a "free appropriate public education" ("FAPE"). 20 U.S.C.A. § 1412(a)(1)(A) (West 2000).

■ A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, ... supported by such services as are necessary to permit the child to benefit from the instruction." *Board of Educ. v. Rowley*, 458 U.S. 176, 188–89, 102. S.Ct. 3034, 73 L.Ed.2d 690 (1982) (internal quotation marks omitted).[1] The appropriate education required, by the IDEA, however, should not be confused

> with the best possible education.... [O]nce a FAPE is offered, the school district need not offer additional educational services. That is, while a state must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.

*MM ex rel. DM v. School Dist.*, 303 F.3d 523, 526–27 (4th Cir.2002) (citations, internal quotation marks, and alterations omitted). Although the IDEA does not require that a state provide the best education possible, "Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advance-

ment, no matter how trivial." *Hall ex rel. Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985).

■ A school provides a FAPE by developing an "Individual Educational Program" ("IEP") for each disabled child. IEPs "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *MM*, 303 F.3d at 527; *see* 20 U.S.C.A. § 1414(d)(1)(A). An IEP is sufficient if it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034.

### B.

Autism is a developmental disorder that affects a child's ability to communicate, use imagination, and establish relationships with others. *See Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 883 (9th Cir.2001). Children with autism generally have significant deficits in language development, behavior, and social interaction. One of the primary ways that children learn is through imitation of the actions and sounds that they see and hear. Autistic children, however, generally have a greatly reduced ability to imitate. Autistic children also lack normal joint attention skills—the ability to follow another's gaze and share the experience of looking at an object or activity. Because these deficits affect the way autistic children learn and develop,

> [e]arly diagnosis is crucial.... [E]ducation (of children as well as of parents

---

1. The Court in *Rowley* was actually addressing requirements of the "Education of the Handicapped Act," *see Rowley*, 458 U.S. at 179, 102 S.Ct. 3034, which, after being amended in 1990, became the IDEA. *See Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 942 n. 1 (4th Cir.1997). "Since the Education of the Handicapped Act and IDEA are the same legislative act, however, we will refer only to IDEA, even when discussing cases that interpreted the Act before its title was changed by the 1990 amendments." *Id.*

and teachers) is the primary form of treatment, and the earlier it starts, the better. Education covers a wide range of skills or knowledge—including not only academic learning, but also socialization, adaptive skills, language and communication, and reduction of behavior problems—to assist a child to develop independence and personal responsibility.

Without early identification and diagnosis, children suffering from autism will not be equipped with the skills necessary to benefit from educational services.

*Amanda J.*, 267 F.3d at 883 (citations and internal quotation marks omitted).

Z.P. was diagnosed as severely autistic when he was two. As the state hearing officer found, Z.P. has significant communication deficits: at 24 months, Z.P. spoke no words and at 31 months he could not follow verbal commands. Z.P. lacks normal joint attention skills and has very little ability to stay "on task." When he was 44 months old, Z.P. could stay on task independently for about five minutes and could quietly wait unattended for approximately 30 seconds. Z.P. is easily frustrated, which can lead to disruptive behaviors such as crying, biting, slapping, kicking, and sweeping items off a table. Z.P. also has deficits in gross motor skills and significant deficits in fine motor skills.

Like many autistic children, Z.P. when given the opportunity will engage in self-stimulatory behavior, often referred to as "stimming." Stimming consists of repetitive patterns of behavior such as flapping of the hands, rocking back and forth, or repeating a word or a sound. Stimming is often "an all-consuming behavior that directly interferes with [an autistic child's] ability to engage in the environment appropriately .... and directly interferes with the child's ability to learn." J.A. 366–

67. Self-stimulatory behavior in autistic children is self-reinforcing, such that the more they engage in the behavior, the more they want to engage in the behavior. Absent appropriate supervision or intervention, stimming can become "the dominant behavior for kids with autism." J.A. 367.

Z.P. has several different forms of self-stimulatory behaviors, including humming and wiggling long slender objects between his fingers while staring at them out of the corner of his eye. Without intervention, Z.P. would engage in stimming "all day long." J.A. 429.

After Z.P. was diagnosed, the parents' search for help led them to what is now known as the Faison School. They enrolled him at Faison in April 2001, when he was not quite three years old. The Faison School uses the "applied behavioral analysis" ("ABA") approach to teaching autistic children. ABA is an iteration of the "Lovaas method," which "involves breaking down activities into discrete tasks and rewarding a child's accomplishments.... [The method] has been widely modified over the years ..., [but] common characteristics include intensive training one-on-one, 30–40 hours per week, discrete trial therapy (DTT), and an in-home component (as opposed to therapy in a professional setting)." *G ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 300 n. 6 (4th Cir.2003) (citations, internal quotation marks, and alterations omitted). At Faison, a team comprised of a teacher and teaching assistants work with the students; the school has four masters-level teachers for each student. One assistant is assigned to each student and is always with that student. The student and his assistant work in a private classroom for much of the day, moving into group sessions for certain activities. Z.P. attends Faison six hours a day, five days a week, thus receiv-

ing 30 hours of one-on-one instruction each week. Z.P.'s parents and his older sister have all received training in ABA methods, and they use the ABA methods with Z.P. at home. While at Faison, Z.P. has made real progress in some areas, and little progress in other areas.

## C.

In October 2001, the School Board identified Z.P. as eligible for special education and related services. The School Board met with the parents and developed an IEP for the 2001–02 school year. The parents rejected that IEP, leaving Z.P. at Faison for that school year. The adequacy of the 2001–02 IEP is not at issue in this appeal.

In the summer of 2002, the School Board evaluated Z.P. to determine his then-current level of performance, testing Z.P. and observing him at Faison. In the fall of 2002, the School Board and the parents met to develop an IEP for the 2002–03 school year. The IEP called for Z.P. to be placed in the pre-school autism class at Twin Hickory Elementary School.

The Twin Hickory program primarily uses the "TEACCH" method, a method for teaching autistic children that was developed in North Carolina and has been adopted by many school districts throughout the country. The TEACCH method differs from the ABA method in many respects. It places greater emphasis on visual skills, encourages independent work on individual skills, and makes extensive use of group instruction. The Twin Hickory teacher, however, made it clear that she incorporates other methodologies in her classroom, including some aspects of ABA therapy.

The Twin Hickory program is staffed by a teacher and a full-time assistant. Twin Hickory has three-hour sessions in the morning and afternoon; during the 2002–03 school year, four students attended the morning session and five attended the afternoon session. One of the students during the morning session had his own aide who worked one-on-one with that student. In each session, students in the Twin Hickory program typically receive about 15 minutes of one-on-one instruction by the teacher, plus some additional one-on-one instruction by the assistant.

In apparent recognition of the severity of Z.P.'s autism, the Board's proposed IEP called for Z.P. to attend both the morning and afternoon session at Twin Hickory. The Board had never before made such a recommendation—all other students attended one session or the other, but not both. The IEP also called for 30 minutes of direct (one-on-one) occupational therapy once a week and 30 minutes of speech therapy three times a week.

Z.P.'s parents requested that the Board provide him with a full-time aide. This request was apparently neither formally rejected or accepted—the IEP stated that the IEP "[t]eam did not refuse/reject this [request] however was unable to determine time frame for training." J.A. 1484.

The parents were not satisfied with the IEP proposed by the School Board. Their primary concern was that the class size at Twin Hickory would prevent Z.P. from receiving the amount of direct (one-on-one) instruction required to keep him focused and on task, particularly since the IEP did not guarantee Z.P. a full-time aide. The parents therefore rejected the IEP, choosing instead to leave Z.P. at the Faison school. After the parents rejected the IEP, they were told by a school employee that an aide had been hired. The Board never formally notified the parents that an aide would be or was in fact hired, and the IEP was not amended to reflect that an aide for Z.P. was hired.

The parents thereafter requested a due process hearing to challenge the appropriateness of the School Board's 2002–03 IEP. *See* 20 U.S.C.A. § 1415(f)(1) (West 2000). In accordance with Virginia's IDEA procedures, an evidentiary hearing was held before a state hearing officer, who heard testimony from numerous witnesses, considered extensive documentary evidence, and personally observed the Faison and Twin Hickory classrooms.

The hearing officer concluded that the Board's 2002–03 IEP did not provide Z.P. with a free appropriate public education. The hearing officer found that Z.P. has a very limited ability to work independently and that he "aggressively engages" in self-stimulating activity when not attended to in a one-on-one situation. J.A. 7. The hearing officer concluded that when Z.P. is engaged in self-stimulatory behavior, he is "so engaged in the activity that his ability to learn is precluded." J.A. 7. In light of the testimony establishing that Z.P. would receive approximately 30 minutes per day of one-on-one instruction at Twin Hickory, the hearing officer concluded that Z.P.'s tendency to self-stimulate could not be adequately kept in check at Twin Hickory, thus precluding Z.P. from learning in that environment:

> Given the number of other children, the requirement to work independently, the natural distractions at Twin Hickory and [Z.P.'s] lack of communication skills, social behavior, inability to stay on task for more than a few minutes, his fear of other children and his severe propensity to self stimulate and his inability to learn when self-stimulating, [Z.P.'s] abil-

ity to access the curriculum offered at Twin Hickory would be so impaired as to deny him educational benefit.

J.A. 12–13.

The hearing officer concluded that the Faison School was an appropriate placement for Z.P. and that the School Board was therefore obligated to pay for the cost of Z.P.'s placement at the Faison School for the 2002–03 school year.[2]*See School Comm. v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (concluding that retroactive reimbursement of private placement costs is an available remedy under IDEA if the school's IEP does not provide a FAPE).

The Board then instituted this action in federal court seeking review of the hearing officer's determination. The district court did not take additional evidence, but instead reviewed the record of the proceedings before the state hearing officer. The district court noted that it was required to give due weight to the findings of the state hearing officer. The district court, however, concluded that the hearing officer had so substantially departed from the fact-finding norm that his findings were entitled to no weight.

According to the district court, the hearing officer improperly accepted the testimony of the parents' witnesses, without giving proper consideration to the testimony of the School Board's witnesses. The district court concluded that the School Board's witnesses were entitled to "great weight," J.A. 1689, and that the hearing officer at a minimum was required to explain why he chose not to credit the testi-

---

2. The hearing officer also determined that the IEP was substantively deficient and did not provide Z.P. with a free appropriate education because it did not include extended school year services. In addition, the hearing officer concluded that two failings he identified as procedural rather than substantive— the omission of a behavioral intervention plan and the failure to indicate how the school would measure compliance with several goals—rendered the IEP legally inadequate. Our disposition of this appeal does not require consideration of these issues.

mony of the School Board's witnesses. In this regard, the district court noted that the Fourth Circuit has repeatedly said that reviewing courts should not "second-guess the educational judgments of school employees." J.A. 1690. The district court never explicitly concluded that the 2002–03 IEP provided Z.P. with a free appropriate public education. The court, however, recounted favorably the testimony of the Board's witnesses in which they expressed their belief that the IEP was appropriate. The district court therefore appears to have implicitly concluded that the 2002–03 IEP provided Z.P. with a FAPE. The district court rejected the hearing officer's analysis and granted summary judgment in favor of the Board. The parents appeal.

## II.

On appeal, the parents contend that the district court failed to give proper deference to the hearing officer's factual findings and legal conclusions. The parents argue that the hearing officer's determination that the 2002–03 IEP did not provide Z.P. with a free appropriate public education was supported by the record and the district court therefore erred by setting aside the hearing officer's decision and granting judgment to the School Board. For its part, the School Board contends that the hearing officer failed to give proper deference to the considered views of its professional educators that the 2002–03 IEP was appropriate, and that the district court therefore properly rejected the hearing officer's conclusions.

## A.

The IDEA authorizes an aggrieved party to bring an action in federal court challenging the decision rendered in the state administrative proceeding. *See* 20 U.S.C.A. § 1415(i)(2)(A) (West 2000). Actions authorized under this provision are procedurally unique in that they are independent civil actions in which the district court considers the record of the state administrative hearing, as well as any new evidence offered by a party, and makes findings based on the preponderance of the evidence. *See* 20 U.S.C.A. § 1415(i)(2)(B). Although the federal action is an independent civil action and not an appeal of the state administrative proceeding, *see Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 384 (4th Cir.2000), the Supreme Court has made it clear that the district court must give "due weight" to the state administrative proceeding. *See Rowley*, 458 U.S. at 206, 102 S.Ct. 3034; *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir.1991) ("Generally, in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings.").

We have concluded that the "due weight" to be given the state administrative proceeding requires that

> findings of fact by the hearing officers in [IDEA] cases ... be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it.
>
> We are further of opinion that when fact-findings are regularly made and entitled to *prima facie* correctness, the district court, if it is not going to follow them, is required to explain why it does not. . . . After giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute.

*Doyle*, 953 F.2d at 105 (citations omitted). In our view, the district court misapplied these standards.

*Doyle* makes it clear that factual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were "regularly made." *Id.* Factual findings are not "regularly made" if they are reached through a process that is "far from the accepted norm of a fact-finding process." *Id.* at 104. For example, in *Doyle* we concluded that a state administrative appeals officer (reviewing the findings of the local hearing officer who conducted the hearing) violated the accepted norms of the fact-finding process by rejecting, on review of a cold record, the testimony of a witness that the hearing officer had found credible, simply because the reviewing officer believed that the witness was acting as an advocate:

> [T]he reviewing officer concluded that Dr. Solomon saw her role as that of an advocate and found her testimony not to be credible. While it is true that by statute and regulation the reviewing officer is required to make an independent decision, we are of opinion that his reason for discrediting a witness who he had not seen or heard testify, in the face of the crediting of that same witness by a hearing officer who had seen and heard the witness testify, is so far from the accepted norm of a fact-finding process designed to discover truth that we think the due weight which should be accorded the decision of the reviewing fact-finding officer depending on that credibility decision is none.

> *Id.*

In this case, the district court concluded that the hearing officer failed to consider and credit the testimony of the School Board's witnesses, which the district court viewed as a sufficient departure from the fact-finding norm under *Doyle* that the

hearing officer's findings should be accorded no weight at all. *See* District Court Opinion, J.A. 1688 ("[T]he Hearing Officer's decision was presumably based on the testimony of the witnesses on both sides. A review of the Hearing Officer's decision, however, suggests that the decision did not adequately, if at all, consider the testimony of the School Board's three expert witnesses...."); J.A. 1689 ("But instead of crediting the testimony of these ... witnesses, the Hearing Officer appears to have relied on and based his decision on the testimony of the [parents'] two experts...."); J.A. 1690 ("In making his decision, the Hearing Officer placed too much, if not exclusive, reliance on the [parents'] experts' testimony and failed to give appropriate consideration to the basis for each witness' opinion."). In our view, what the district court identified as failings on the part of the hearing officer are not failings at all, much less failings of a degree that would warrant a wholesale rejection of the hearings officer's findings.

The hearing officer's opinion was thorough, with many citations and references to the testimony of the School Board's witnesses. It is thus clear that the hearing officer did give careful consideration to the opinions of the School Board's witnesses. As to what the hearing officer believed was the critical issue—whether Z.P. then had the ability to access Twin Hickory's curriculum—the hearing officer was persuaded by the testimony of the parents' witnesses.

The hearing officer noted Z.P.'s strong propensity to engage in self-stimulatory behavior if left on his own, a conclusion that was supported by the testimony of the parents' witnesses and by that of a School Board witness.[3] The hearing officer con-

**3.** Lynn Blachman is a speech pathologist for Henrico County who evaluated Z.P. She testi- fied that Z.P. engaged in self-stimulatory be-

cluded that while some autistic children can learn while engaging in self-stimulatory behavior, Z.P.'s "stimming" was so severe that he could not learn while engaging in self-stimulatory behavior. The hearing officer noted that the classroom at Twin Hickory, which was larger than Z.P.'s private room at the Faison School, would be too stimulating and too distracting to Z.P., another conclusion supported by the testimony of a School Board witness.[4] The hearing officer also determined that the class size at Twin Hickory would preclude Z.P. from receiving the amount of direct, one-on-one instruction that would be necessary to keep him focused and to stop him from engaging in self-stimulatory behavior. These facts, all of which find support in the record, led the hearing officer to conclude that Z.P. would not be able to receive any educational benefit from the Twin Hickory program.

The evidence presented by the School Board on these points was simply not of the nature or quality that would *require* the hearing officer to accept it over that of the parents' witnesses. The School Board presented evidence that the Twin Hickory staff was able to sufficiently control the behavior of their students, and that other students suffering from severe autism have benefitted from the Twin Hickory curriculum. The Twin Hickory teacher testified that no particular skills are required of a new student, because she and her assistants teach whatever skills are missing. While this evidence was relevant, it is not so compelling that we can conclude, as the district court apparently did, that the hearing officer was required to accept it. The hearing officer recognized that other students had benefitted from the Twin Hickory program, but simply concluded that Z.P.'s problems were so severe that he would not be able to benefit.[5]

To be sure, the hearing officer did not specifically state that he found the testimony of the School Board's witnesses to be less credible on these points. *Doyle,* however requires the *district court* to explain its reasons for rejecting the findings of the hearing officer; it does not require the *hearing officer* to explain in detail its reasons for accepting the testimony of one witness over that of another. In any event, the hearing officer's analysis and explanation for the basis of his ruling make it clear that he was not persuaded,

---

havior when not engaged in one-on-one instruction. *See* J.A. 194.

4. Carolyn Stone, a Henrico County occupational therapist, provided therapy to Z.P. during the 2001–02 school year, when he was attending the Faison School. She also evaluated Z.P. in conjunction with the School Board's preparation of the 2002–03 IEP. One of her evaluations of Z.P. was conducted at an elementary school, in a "regular sized classroom" similar to the Twin Hickory classroom. She was unable to complete the evaluation because "[t]he testing room was clearly too large and too stimulating to afford [Z.P.] the opportunity to attend to testing materials." J.A. 94.

5. The School District complains that the hearing officer ignored the fact that an aide was hired for Z.P. after the IEP was written. We believe that the hearing officer properly focused on what was actually contained in the written IEP when determining the appropriateness of that IEP. *See Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 768 (6th Cir.2001) ("The district court erred in relying on the [hearing officer's] finding that [the school district] had the capacity to offer [the child] appropriate placement. The district court should have limited its assessment to the terms of the draft IEP document itself. Although there was evidence in the record indicating what could have been provided at [the proposed school], only those services identified or described in the draft IEP should have been considered in evaluating the appropriateness of the program offered.").

and why he was not persuaded by the School Board's evidence. We have held that credibility determinations implicit in a hearing officer's decision are as entitled to deference under *Doyle* as explicit findings. *See A.B. ex rel. D.B. v. Lawson,* 354 F.3d 315, 327–28 (4th Cir.2004) (reversing district court's opinion which rejected decision of hearing officer and noting that "the district court disregarded the ALJ's resolution of conflicting expert testimony. The ALJ carefully considered the views of [the student's] experts ..., implicitly finding them unconvincing while crediting the contrary views of [the School District's] experts"). Thus, contrary to the district court's conclusion, the mere fact that the hearing officer accepted the evidence of the parents over that of the School Board is not a reason to reject the hearing officer's findings.

We recognize, of course, that at all levels of an IDEA proceeding, the opinions of the professional educators are entitled to respect. *See Rowley,* 458 U.S. at 206, 102 S.Ct. 3034 ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."). The respect and deference that must be accorded to those professional opinions, however, does not give a district court license to ignore the requirement of *Rowley* and *Doyle* that the findings of the *administrative proceeding* must be given due weight:

> The district court ... viewed the decision of the state hearing officers, reviewing the decision of the School Board pursuant to federal and state statutes and regulations, as the decision to which deference was due [under *Rowley* ].... The district court properly gave due weight to the results of the state administrative proceedings. *To give deference only to the decision of the School Board would render meaningless the entire process of administrative review.*

*School Bd. v. Malone,* 762 F.2d 1210, 1217 (4th Cir.1985) (emphasis added).

Nor does the required deference to the opinions of the professional educators somehow relieve the hearing officer or the district court of the obligation to determine as a factual matter whether a given IEP is appropriate. That is, the factfinder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate. The parents presented evidence (outlined above) tending to show that, because of the nature and severity of Z.P.'s problems, the IEP would not provide Z.P. with a educational benefit. The IDEA gives parents the right to challenge the appropriateness of a proposed IEP, and courts hearing IDEA challenges are required to determine independently whether a proposed IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034; *see Tice ex rel. Tice v. Botetourt County Sch. Bd.,* 908 F.2d 1200, 1207 (4th Cir.1990) ("Neither the district court nor this court should disturb an IEP simply because we disagree with its content. Rather, we must defer to educators' decisions *as long as* an IEP provided the child the basic floor of opportunity that access to special education and related services provides." (emphasis added, internal quotation marks omitted)). To conclude that the hearing officer erred simply because he did not accept the testimony of the School Board's witnesses, an argument that the School Board comes very close to making, would render meaningless the due process rights guaranteed to parents by the IDEA. *See Malone,* 762 F.2d at 1217.

The School Board, however, contends that hearing officer's findings are entitled to no deference because he failed to consider the bases for the witnesses' opinions. The School Board characterizes this as "a major fact-finding error because there was a wide disparity in the witnesses' knowledge of the proposed program." Brief of Appellees at 17. We agree with the School Board that the parents' witnesses had limited knowledge about the general success of the Twin Hickory program. And if the hearing officer had relied on the parents' witnesses to conclude that the Twin Hickory program was a bad one, then we might agree with the School Board's position that the hearing officer's findings do not warrant any deference. The hearing officer, however, accepted and acknowledged that students had benefitted from the Twin Hickory program. See J.A. 494 ("I take it for granted that students have succeeded at both institutions.... I think there are a lot of students who succeed in both programs.").[6] The hearing officer relied on the testimony of the parents' witnesses to conclude that Z.P.'s unique problems made the Twin Hickory program inappropriate *for Z.P.;* the hearing officer did not conclude that the Twin Hickory program was inappropriate for all autistic students. Given the basis for the hearing officer's conclusion that the IEP did not provide Z.P. with a free appropriate education, it was entirely proper for the hearing officer to rely primarily on the testimony of the parents' witnesses.

██ To the extent that the district court concluded that the hearing officer's findings were not entitled to deference because the decision was premised on the hearing officer's preference for the ABA methodology used by the Faison school over the TEACCH methodology used at Twin Hickory, we again disagree. Neither a state administrative hearing officer nor a reviewing court may reject an otherwise appropriate IEP because of dissatisfaction with the educational methodology proposed in the IEP. If an IEP is "reasonably calculated to enable the child to receive educational benefits," *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034, the hearing officer cannot reject it because the officer believes that a different methodology would be better for the child. See *id.* at 208, 102 S.Ct. 3034 ("[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."); *MM,* 303 F.3d at 526 ("The IDEA does not ... require a school district to provide a disabled child with the best possible education."). As we have explained above, the hearing officer concluded that the School Board's IEP was not appropriate and did not provide Z.P. with a FAPE because Z.P.'s problems were so severe that they would have precluded him from accessing the curriculum that would

---

6. The School Board contends the hearing officer gave short shrift to its evidence of the general success of its Twin Hickory program. We agree with the School Board that it was entitled to consider its past successes with autistic students when formulating the IEP. But even assuming that the hearing officer should have permitted the School Board to present more evidence of its past successes, any error in this regard would be harmless and would not warrant a wholesale disregard of the hearing officer's findings, given the officer's explicit acknowledgment that students have succeeded under the School Board's TEACCH curriculum. Moreover, as the hearing officer concluded, the ultimate inquiry in an IDEA case is whether the IEP is appropriate for the individual student. Past success of the proposed program is certainly relevant to that inquiry, but it is not dispositive. That is, a hearing officer (or reviewing court) cannot conclude that a proposed IEP is appropriate for a given student simply because similar IEPs were appropriate for other students. To do so would eliminate the individualized inquiry that is at the heart of the IDEA.

have been provided at Twin Hickory. If the School Board's IEP were appropriate, then it would have been impermissible for the hearing officer to reject it simply because he thought the Faison program would be better for Z.P. But that is not what the hearing officer did. The hearing officer concluded, as a factual matter, that the School Board's IEP was not appropriate for Z.P., but that the Faison program was appropriate. Thus, the hearing officer did not impermissibly impose on the School Board what he believed was a better method for teaching Z.P.

Accordingly, for the reasons discussed above, we conclude that the hearing officer's factual findings were "regularly made." *Doyle,* 953 F.2d at 105. The district court, therefore, erred by failing to treat the hearing officer's findings as presumptively correct. *See id.*

### B.

Because we conclude that the district court erred by failing to give appropriate deference to the findings of the hearing officer, we must now determine what effect this error has on our disposition of this appeal.

■ Whether an IEP is appropriate and thus sufficient to discharge a school

board's obligations under the IDEA is a question of fact, *see DiBuo ex rel. DiBuo v. Board of Educ.,* 309 F.3d 184, 188 n. 8 (4th Cir.2002); *see also Doyle,* 953 F.2d at 106, reviewed under a clear error standard. *See Carter ex rel. Carter v. Florence County Sch. Dist. Four,* 950 F.2d 156, 160 (4th Cir.1991) (affirming district court's finding that IEP was not appropriate because district court's conclusion was not clearly erroneous), *aff'd,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Matthews ex rel. Matthews v. Davis,* 742 F.2d 825, 831 (4th Cir.1984) (applying clear error standard to district court's factual finding in IDEA case). While the district court concluded that the School Board's 2002–03 IEP was appropriate, that factual finding was the product of the district court's conclusion that the hearing officer's factual findings were not "regularly made" and thus entitled to no deference, conclusions that we have rejected. The district court's determination that the IEP was appropriate is therefore not entitled to deference by this court. *Cf. Consolidation Coal Co. v. Local 1643, United Mine Workers of Am.,* 48 F.3d 125, 128 (4th Cir.1995)("[T]he clearly erroneous rule does not protect findings made on the basis of the application of incorrect legal standards." (internal quotation marks omitted)).[7]

---

**7.** The district court's order in this case is denominated as an order granting summary judgment in favor of the School Board. Because section 1415(i)(2)(B)(iii) of the IDEA requires the district court to "bas[e] its decision on the preponderance of the evidence," the statute requires the district court to independently make factual findings regarding the appropriateness of the proposed IEP. *See, e.g., Board of Educ. v. Illinois Bd. of Educ.,* 41 F.3d 1162, 1166 (7th Cir.1994) ("[A] district court must independently determine whether the requirements of the Act have been satisfied."). It therefore would seem that the court is entering judgment after what amounts to a bench trial, whether the district court considered new evidence or simply proceeded on the basis of an unsupplemented administrative record. *See Kirkpatrick v. Lenoir County Bd. of Educ.,* 216 F.3d 380, 385 n. 4 (4th Cir.2000) ("Several courts also indicate that the matter is before the court on cross-appeals or cross-motions for summary judgment despite the fact that there are clearly disputed issues of material fact. As we conclude, IDEA actions are original civil actions that should typically be disposed of by motions for judgment."); *Beth B. v. Van Clay,* 282 F.3d 493, 496 n. 2 (7th Cir.2002) (noting that district court's disposition of IDEA case "is perhaps better described as judgment on the record."). This understanding of the nature of IDEA proceedings before the district

In some IDEA cases, this court has concluded that similar errors required us to remand the case to the district court so that the court could make findings based on a consideration of the evidence under the correct legal standard. *See, e.g., JH ex rel. JD v. Henrico County Sch. Bd.*, 326 F.3d 560, 567–69 (4th Cir.2003) (concluding that district court and hearing officer applied incorrect legal standard when determining whether extended school year services were necessary to provide a FAPE and remanding for reconsideration under the correct standard); *Fort Bragg Dependent Sch.*, 343 F.3d at 309 (concluding that the district court analyzed claim for compensatory education under an incorrect standard and remanding for reconsideration); *Doyle*, 953 F.2d at 105–06 (concluding that the district court failed to give proper deference to the hearing officer's factual findings that an IEP was not appropriate and remanding for reconsideration under the proper standard). But in other cases, this court has made a ruling on the merits of the case without a re-

mand. *See, e.g., A.B.*, 354 F.3d at 330, 332 (concluding that the district court erred by failing to give proper deference to the hearing officer's findings and concluding, without remanding for additional fact-finding by the district court, that the proposed IEP was appropriate); *Hartmann ex rel. Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1005 (4th Cir.1997) (concluding that district court failed to give proper deference to hearing officer's findings and directing that parents' challenge to hearing officer's decision be dismissed).

■ As we have indicated previously, we believe that the hearing officer's factual findings are supported by evidence in the administrative record and are entitled to deference under *Rowley* and *Doyle*. The record in this case would therefore support a conclusion by the district court that the 2002–03 IEP is inappropriate because it is not "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034.

court is reflected in IDEA cases from this court applying (sometimes implicitly) not a summary judgment standard of review, but instead the clear error standard of review traditionally applied to cases involving fact-finding by a district court. *See Wagner ex rel. Wagner v. Board of Educ.*, 335 F.3d 297, 301 (4th Cir.2003) ("The district court apparently believed that type of remedy insufficient in this case. The impetus for the district court's belief was its finding of fact that Daniel's then-current placement was unavailable because CSAAC could not be counted upon to provide services. That finding was certainly not clearly erroneous, and we affirm it on appeal." (citation omitted)); *Carter ex rel. Carter v. Florence County Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir.1991) (affirming district court's finding that IEP was not appropriate because district court's conclusion was not clearly erroneous), *aff'd*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Burke County Bd. of Educ. v. Denton ex rel. Denton*, 895 F.2d 973, 980 (4th Cir.1990) (applying clear error standard to district court's factual

finding in IDEA case); *Matthews ex rel. Matthews v. Davis*, 742 F.2d 825, 831 (4th Cir. 1984) (applying clear error standard to district court's factual finding in IDEA case). We recognize that the clear-error standard of review may be in some tension with the standard set forth in certain recent cases from this court. *See MM ex rel. DM v. School Dist.*, 303 F.3d 523, 530–31 (4th Cir.2002); *see also A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 324–25 (4th Cir.2004); *JH ex rel. JD v. Henrico County Sch. Bd.*, 326 F.3d 560, 566 (4th Cir.2003); *G ex rel. RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 302–03 (4th Cir. 2003). We need not, however, decide whether there is an actual (rather than merely semantical) difference between the standards of review set forth in *MM* and the clear-error cases, because any difference would not be relevant to our disposition of this case. As we will explain *infra*, we believe that a remand to the district court is required in this case, an action that is consistent with a clear error standard of review and is not precluded by the standard set forth in *MM*.

At this juncture, however, we are not confident that such a conclusion would be compelled. *See Doyle*, 953 F.2d at 105 ("[W]e think that findings of fact by the hearing officers in cases such as these are entitled to be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it."). Because the IDEA requires the district court, while giving deference to the hearing officer's decision, to make an independent finding as to the appropriateness of the IEP, we believe it is prudent in this case to remand so that the district court can make the required findings under the proper legal standard. A remand is also required because the district court, given its conclusion that the IEP was appropriate, did not make any findings with regard to the appropriateness of Z.P.'s placement at the Faison School, a fact that is essential to the parents' right to tuition reimbursement. *See, e.g., A.B.*, 354 F.3d at 320 ("When a state receiving IDEA funding fails to provide a FAPE, the child's parent may remove the child to a private school and then seek tuition reimbursement from the state. The parent may recover if (1) the proposed IEP was inadequate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs." (citation omitted)).

On remand, the district court shall reconsider the question of the appropriateness of the School Board's 2002–03 IEP, giving deference to the hearing officer's decision.[8] If after according deference to the hearing officer's decision the district court still concludes that the IEP is appropriate, the district court must explain its

decision, as required by this court in *Doyle. See Doyle*, 953 F.2d at 105 ("[W]hen fact-findings are regularly made and entitled to *prima facie* correctness, the district court, if it is not going to follow them, is required to explain why it does not."). And, as noted above, if the district court concludes that the IEP is not appropriate, it must then determine whether the Faison School's program is appropriate. *See A.B.*, 354 F.3d at 320.

### III.

Because we conclude that the district court erred by failing to give deference to the decision of the state hearing officer, we reverse the district court's order and we remand for reconsideration consistent with the principles set forth in this opinion.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

GREGORY, Circuit Judge, dissenting:

The district court rightly held that the hearing officer's findings should not be followed because the hearing officer substituted his own views on education policy—and those of Z.P. and his experts—for the determinations of the local educators charged with formulating an individualized education program ("IEP"). The majority's opinion unwittingly thwarts the purpose of the Individuals with Disabilities Act ("IDEA") by supporting the hearing officer's misapplication of the law. Thus, I respectfully dissent.

As the majority notes, Z.P. was diagnosed with autism at age two. He was referred to a School Board child study committee approximately three months after he was diagnosed. "Prior to comple-

---

8. This inquiry shall include reconsideration, under the proper standard of deference, of the hearing officer's findings with regard to the need for extended school year services and a

behavioral intervention plan, as well as the IEP's failure to indicate how compliance with certain goals would be measured.

tion of the child study committee evaluations, Z.P.'s parents enrolled him in the Faison School program." J.A. 3. The School Board child study committee identified Z.P. as developmentally delayed and determined that he was eligible to receive special education and related services. However, Z.P.'s parents never enrolled him in public school. They rejected the School Board's IEPs for the 2001–02 and 2002–03 school years.

It is undisputed that Z.P. is severely autistic. The School Board asserts that it is prepared to meet Z.P. at his current level,[1] as it does with other severely autistic children, and provide him educational benefit. As the majority recognizes, the School Board contends that its program can educate a child who has "no particular skills" and that the teacher in conjunction with "her assistants teach whatever skills are missing." *Ante* at 306. However, Z.P.'s parents argue that without one-on-one teacher-child education, Z.P. will receive no educational benefit and will not progress.

After the due process hearing, the hearing officer found:

> Given the number of other children, the requirement to work independently, the natural distractions at Twin Hickory and [Z.P.'s] lack of communication skills, social behavior, inability to stay on task for more than a few minutes, his fear of other children and his severe propensity to self stimulate and his inability to learn when self stimulating, [Z.P.'s] ability to access the curriculum offered at Twin Hickory would be so impaired as to deny him educational benefit.

J.A. 12. However, neither the parents' expert witnesses nor the hearing officer were able to establish in the record that Z.P.'s autism is more severe or significantly different than other children that have received educational benefit at Twin Hickory.

According to the hearing officer, Dr. Carlson agreed that the more severe the autism, the more intense the service should be. To address intensity, the School Board offered Z.P. both morning and afternoon instruction.[2] Nevertheless, the hearing officer found that this was not enough, stating:

> If Dara Butler had only one autistic child to teach she may choose to employ TEACCH[3] or the ABA methodology depending on that child's needs. The child given that level of intense instruction may very well respond to either method. The IEP did not indicate that Z.P. was going to get this type of intense personal supervision and accordingly, given his many problems and defects he would not be able to benefit from the program at Twin Hickory.

J.A. 13. However, what the hearing officer describes would not be using the TEACCH method. The TEACCH method involves a great deal of visual stimulation, considerable work on individual skills, and extensive group instruction. Thus, what the hearing officer was actually concluding was that without one-on-one instruction, like the ABA method primarily used at Faison, Z.P. can not receive educational benefit. His conclusion is a methodological one and the record does not support it.

1. The School Board does not dispute that Z.P., if left alone, engages in self-stimulatory behavior and that while stimming he cannot learn.

2. The hearing officer infers from the fact that Z.P. was offered services for both sessions that he must be uniquely severely autistic. J.A. at 12. His inference is unsubstantiated.

3. TEACCH is an acronym for the Treatment and Education of Autistic and Communication Handicapped Children, which is a Public Health Program developed in North Carolina.

There is no evidence in the record that the TEACCH method, as employed by Twin Hickory, does not provide educational benefit to children as severely autistic as Z.P. The hearing officer fails to recognize this fact, but instead bases his decision on the testimony from one of the parents' experts, Dr. Carlson,[4] and his own limited observations. In so doing, he fails to give the appropriate deference required to the School Board witnesses as professional educators.[5] *See MM v. Sch. Dist.*, 303 F.3d 523, 533 (4th Cir.2002). In *MM,* we noted:

> We have always been, and we should continue to be, reluctant to second-guess professional educators. As we observed in *Tice v. Botetourt County School Board,* "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals." Indeed, we should not "disturb an IEP simply because we disagree with its content," and we are obliged to "defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides."

*MM,* at 532 (internal citations omitted).

Further, it is the parents' burden to prove that the IEP developed by the public school is inappropriate and denies the student a FAPE. *Weast v. Schaffer ex rel. Schaffer,* 377 F.3d 449, 456 (4th Cir.2004) (holding that "parents who challenge an IEP have the burden of proof in the administrative hearing"). They must prove this against an appropriate amount of deference given to the local educators by the hearing officer. Plaintiffs must also carry that burden in the district court. *Bd. of Educ. v. I.S.,* 325 F.Supp.2d 565 at 578 (D.Md.2004) ("As the party challenging the administrative findings, Plaintiffs bear the burden of proof of establishing a violation of the IDEA.") (citing *Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991), cert. denied, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991)). We also held in *Barnett:*

> Congress chose to leave the section of educational policy and methods where they traditionally have resided—with state and local school officials. In addition, Congress's goal was to bring handicapped children into the public school system and to provide them with an education tailored to meet their particular needs.... Ultimately, the Act mandates an education for each handicapped child that is responsive to his or her needs, *but leaves the substance and the details of that education to state and local school officials.*

927 F.2d at 151–152 (emphasis added and citations omitted).

Moreover, the Supreme Court held in *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley:*

> The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child. The Act expressly charges States with the responsibility of "acquiring and disseminating to teachers and administrators of programs for handicapped children significant information derived from educational research, demonstration, and similar projects, and [of] adopt-

---

**4.** Dr. Carlson had a limited base of knowledge about the program at Twin Hickory; thus his ability to opine about the educational benefit Z.P. was likely to gain was also limited.

**5.** All of the School Board's witnesses testified that Z.P. would receive educational benefit at Twin Hickory.

ing, where appropriate, promising educational practices and materials." § 1413(a)(3).

458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

Because the hearing officer did not give deference to the local educators and did not consider as evidence the School Board's ability to provide educational benefit to severely autistic children at Twin Hickory, the professional judgment of the local educators was undermined, which is contrary to Congressional intent.[6]

Further, the hearing officer does not explain why the public school professional educators' testimonies do not deserve any deference. Even though the majority recognizes that the School Board's witnesses teach severely autistic children at Twin Hickory, that these professionals have also tested Z.P., and that they have testified that their program is appropriate and will benefit him, the majority still concludes that the hearing officer need not give the professional educators deference or explain why he is dismissing their opinions. *Ante* at 306–07.

The majority and the hearing officer treat the parents' experts, who are not local educators, as if they are on par with the School Board's experts, who are local educators. That is simply not appropriate or consistent with IDEA case law. *Hartmann by Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) ("Absent some statutory infraction, the task of education belongs to the educators who have been charged by society with that critical task."); *Devine v. Indian River County Sch. Bd.*, 249 F.3d 1289, 1292 (11th Cir.2001) ("[G]reat deference must be paid to the educators who develop the IEP."); *Wagner v. Bd. of Educ.*, 340 F.Supp.2d 603, 611 (D.Md.2004) (noting that the "court owes generous deference (as did the ALJ) to the educators on Daniel's IEP Team"). If the hearing officer is not required to explain how he arrived at his opinion and why he did not give deference to the professional local educators, especially when he finds against the School Board, then the required deference that is due to professional local educators would be meaningless.[7] Here, by not affording the School Board the appropriate deference the administrative findings were not made in a regular manner. Thus, they should not be considered *prima facie* correct and are not entitled to due weight by the district court or this court.

The hearing officer in this case applied the incorrect standard for determining whether the School Board had proposed an appropriate IEP for Z.P. He stated that "[i]t is difficult for this Hearing Officer to

6. It is apparent from the transcript of the hearing, that the hearing officer did not think that the School Board's experience with other severely autistic children was relevant. The hearing officer states, "I don't think that this witness can say or anybody can draw a conclusion that if one student succeeded here or over here that that necessarily means that [Z.P.] is going to succeed anywhere. So I think the whole issue of whether or not other students have succeeded is immaterial." J.A. 494. This is problematic since Z.P. has only been at Faison, thus Twin Hickory's experience with other similarly severely autistic children is the only, as well as quite compelling, evidence that the School Board has to

show that its program can provide educational benefit to Z.P.

7. The majority finds that the hearing officer has no duty to "explain in detail its reasons for accepting the testimony of one witness over that of another." *Ante* at 306–07. Yet there is considerable authority that due process of law requires that the nonjudicial decision maker—the agency or its hearing officer as distinct from a judge or a jury—"should state the reasons for his determination and indicate the evidence he relied on." *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

understand how the less intense program used at Twin Hickory would result in more progress." J.A. 14. The hearing officer misconstrues what is required of an IEP under the IDEA. The IEP is not required to give *more* educational progress to a child than his private placement in order to be appropriate. The Supreme Court has said that a student is only entitled to *some* educational benefit; the benefit need not be maximized to be adequate. *See Rowley*, 458 U.S. 176, 200–01, 102 S.Ct. 3034, 73 L.Ed.2d 690 ([T]o require … the furnishing of every special service necessary to maximize each handicapped child's potential is … further than Congress intended to go."). With this as the IDEA standard and using the proper deference to the public educators, it is difficult to understand how the hearing officer found, based on a preponderance of the evidence standard, that Z.P. was denied a FAPE.

Here, the hearing officer relied on little to no empirical data to support his conclusion that Z.P.'s autism was so severe that he would not benefit from the Twin Hickory program and the IEP the School Board developed. The hearing officer also did not give the appropriate deference to the testimony of professional local educators like Ms. Butler,[8] the teacher who would have actually taught Z.P. at Twin Hickory, who testified that she had had similarly severely autistic children in her class before and that they had received significant education benefit.

The majority concludes that the district court found that the hearing officer's opinion was due no deference because he did "not adequately, if at all, consider the testimony of" Mrs. Stone, Mrs. Blachman, or Dr. Driver, three of the School Board's witnesses. 285 F.Supp.2d 701, 706

(E.D.Va.2003). That conclusion misses the mark. In sum, what the district court correctly determined was that the hearing officer's's opinion was not entitled to presumptive validity because the hearing officer did not make his decision in a regular manner or with evidentiary support because he did not give the local educators the adequate deference required. For the reasons stated above, I agree. Therefore, I would affirm the decision of the district court.

---

8. Ms. Butler is a trained and certified special education educator, with three years experi-

ence teaching autistic children. J.A. 218–19.